State, ex rel. Harte, v. Moorhead.

---

STATE, EX REL. AUGUST C. HARTE, RELATOR, v. HARLEY G. MOORHEAD, RESPONDENT.

FILED MARCH 7, 1916. No. 19510.

1. Mandamus: PARTIES: ACT CREATING COMMISSIONER DISTRICTS: CONSTITUTIONALITY. An elector of a county has such interest in the government of the county as to enable him to challenge the constitutionality of a statute which attempts to divide the county into commissioner districts and fix the basis of representation in the county board, on the ground that such statute deprives the voters of the county of equality before the law.

2. Constitutional Law: STATUTE: VALIDITY. "An act which violates the true meaning and intent of the Constitution and is an evasion of its general express or plainly implied purpose is as clearly void as if in express terms prohibited." State v. Bartley, 41 Neb. 277.

3. ———: RESERVATION OF POWERS. Our Constitution (Art. I, sec. 26) declares that "all powers not herein delegated remain with the people." This is characteristic of a republican form of government and distinguishes such government from a monarchy or oligarchy.

4. ———: EQUALITY: RIGHTS OF VOTERS. Under our Constitution all government derives its "just powers from the consent of the governed" (Art. I, sec. 1), and the principle of "equality before the law" requires that every voter shall, as far as practicable, have an equal voice in the affairs of government.

5. Counties: POWERS: RIGHTS OF VOTERS. The power of local legislation and other governmental powers are delegated to the counties, and in the exercise of those powers all voters of the county must, as far as practicable, be given an equal voice.

6. Elections: DISTRICTS: APPORTIONMENT. It is not required that equality of representation shall be mathematically exact. But the apportionment of representatives of the people in any government body must be according to the population represented as near as may be.

7. Constitutional Law: ELECTION DISTRICTS. The legislature has no power to disregard the constitutional standard of apportionment because of the nature and character of the population and business interests. The constitution will not permit one class of voters to be given more power in governmental affairs than is given to another class.

8. ———: LEGISLATIVE MOTIVES: PROOF. The courts will not inquire into nor consider the motives that may have actuated the legislature, except as those motives appear in their public acts or journals. The validity of an act does not depend upon the motive for its passage; but, whenever and to the extent that the legislature transcends its powers, it is conclusively presumed that it intended to so transcend them, and parol evidence of good motives or other considerations are not allowed to obviate the effect of such unlawful intent.

9. ———: LEGISLATIVE ACTS: COMPLIANCE WITH CONSTITUTION: QUESTION FOR COURTS. There is no doubt that the legislature may exercise a reasonable discretion in selecting the method of securing practical equality. But the question whether constitutional requirements have been applied at all is a question for the courts.

10. ———: ELECTION DISTRICTS: APPORTIONMENT. Chapter 19, Laws 1915, which provides that counties of more than 125,000 inhabitants shall be divided into five districts, and that all territory outside of a metropolitan city and more than two miles from the limits of such city shall comprise one of those districts and have equal representation upon the county board with each of the other four districts, is unconstitutional, because the result is that in Douglas county, to which the act applies, the district so formed will contain less than one-third of the population of each of the

other districts and would have equal power in the government of the county.

Original proceeding in mandamus to compel respondent, as election commissioner, to place the name of relator on the primary ballot as candidate for county commissioner. *Writ allowed.*

*Myron L. Learned,* for relator.

*George A. Magney* and *Ray J. Abbott, contra.*

SEDGWICK, J.

By chapter 150, Laws 1913 (Rev. St. 1913, sec. 979), it was provided: "Counties having more than one hundred and twenty-five thousand inhabitants, shall be divided into five districts numbered respectively one, two, three, four and five, and shall consist of two or more voting precincts, comprising compact and contiguous territory and embracing, as near as may be possible, an equal division of the population of the county, and not subject to alteration oftener than once in four years."

In 1915 (Laws 1915, ch. 19) the legislature enacted a statute entitled "An act to amend section 979, Revised Statutes of Nebraska for 1913, relating to commissioner districts, and to repeal said original section." The act provides: "Counties having more than one hundred and twenty-five thousand inhabitants, shall be divided into five districts numbered respectively one, two, three, four and five, and shall within the incorporated limits of any city of the metropolitan class or city of the first class in such county and within the territory comprised within two miles of such incorporated limits consist of two or more voting precincts comprising compact and contiguous territory and embracing, as near as may be possible, an equal division of the population of such cities and adjacent territory as hereinbefore provided and not subject to alteration oftener than once in four years: Provided, that all of the territory in such county outside the limits of such

city of the metropolitan class and city of the first class
and such adjacent territory as hereinbefore provided, shall
comprise one commission district and the person repre-
senting such district shall be a resident therein and one
commissioner shall be nominated by each of said districts,
but shall be elected by the qualified electors of the entire
county, as heretofore provided. The district lines shall
be made to conform to the division herein made so that
the commissioner to be elected at the next general election
in 1916 shall be elected from the district outside of such
metropolitan city and city of the first class and adjacent ter-
ritory as hereinbefore provided for and after such division
the district lines shall not be changed at any session of
the board unless all of the commissioners are present at
such session: Provided, in counties of one hundred and
twenty-five thousand inhabitants or more, and in counties
where a majority have voted for five commissioners it shall
be the duty of the county board of such county, at their
first meeting after the publication of the state or federal
census, or after an election deciding to have five, to divide
said county into five commissioner districts, as provided
for."

Douglas county is the only county in the state having
the specified number of inhabitants, and therefore is alone
interested in this controversy. Under the former statute
the county had been divided into commissioner districts,
and relator resided within the two-mile limit of the city of
Omaha and in the third commissioner district, which em-
braced also a part of the territory without the two-mile
limit. The relator applied to this court for a writ of
mandamus to require the respondent, who is election com-
missioner of Douglas county, to "receive and file the
nomination papers of your relator, and place his name
upon the official primary ballot for the primary election
to be held April 18, 1916, as a candidate for the nomina-
tion of county commissioner in the third commissioner
district in Douglas county, Nebraska, as defined July 9,
1906." The respondent appeared and answered the appli-

cation for the writ. In his brief it is conceded that "there is but one question at issue in this case: Is chapter 19, Laws of 1915, unconstitutional?" Later in the brief it is suggested that "the only persons who could complain would be those who are in some way injured by such a division of the county. The relator is not injured and has no right to complain." But this point is not seriously contested. The supreme court of Michigan remarked in a similar case: "This court, as appears from the authorities above cited, has taken care to prevent officious intermeddling by the use of this discretionary writ, and at the same time has swept away technicalities where public interests are involved and prompt action is necessary. We have quite uniformly overruled this objection in cases of the latter class." *Giddings v. Blacker*, 93 Mich. 1.

Is the act of 1915 unconstitutional? The result of that act as applied to Douglas county is that there are four districts comprising Omaha and the territory two miles in width around the city, which contains over 18,000 voters, and the remaining district is a narrow strip around the outside of the two-mile limit, and contains only about 1,700 voters. This district is in two parts not contiguous. The relator contends that the statute is unconstitutional because it violates section 4, art. IV of the federal Constitution, which guarantees to every state a republican form of government, and that it violates the first section of the fourteenth amendment, which provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," and that it violates both express and implied provisions of the Constitution of Nebraska. It is contended that a statute which so divides a county into districts that an elector in one district has as much voice in the control of the affairs of the county as do three or four electors in another district is unconstitutional. "The fact that a statute is within the letter of the Constitution is not sufficient. * * * An act which violates the true meaning and intent of the Constitution and is an evasion of its

general express or plainly implied purpose is as clearly void as if in express terms prohibited." *State v. Bartley,* 41 Neb. 277. That this statement of the law is substantially correct has never been controverted in this state. In *State v. Seavey,* 22 Neb. 454, it was decided that the provision of an act of the legislature "making it the duty of the governor to appoint a board of fire and police commissioners for cities of the metropolitan class is not repugnant to the Constitution." In *State v. Moores,* 55 Neb. 480, a contrary view appears to have been taken, which was affirmed in *State v. Kennedy,* 60 Neb. 300. The discussion is at great length, occupying some 60 pages of the report. The opinion by Judge Norval, and concurred in by Judge Harrison, cites many authorities. The dissenting opinion prepared by Mr. Commissioner Ryan, and concurred in by Judge Sullivan and Commissioner Irvine, presents also a quite exhaustive discussion of the question with citation of many authorities. Afterwards, in *Redell v. Moores,* 63 Neb. 219, the personnel of the court having changed in the meantime, *State v. Moores, supra,* is expressly overruled, and the doctrine announced was: "The legislature may by statute confer upon the governor the power to appoint members of the board of fire and police commissioners of cities of the metropolitan class." These decisions are referred to in *State v. Savage,* 64 Neb. 684.

In *Newport v. Horton,* 22 R. I. 196, 50 L. R. A. 330, it is said that all of the authorities except *State v. Moores, supra,* seem to be that a statute authorizing the governor to appoint a board of police commissioners for a city is not unconstitutional as interfering with the right of local self-government; "with the exception stated, not one has denied the general power of the legislature to assume the control of the local police." In an extensive note (50 L. R. A. 330) it is contended that the court was in error in its construction of the laws of Rhode Island. The opinion of the court, however, is instructive. It distinguishes between police officers and governmental officers of cities and other divisions of the state. The court said:

"Obviously this must depend upon the status of a police officer. In *Kelley v. Cook*, 21 R. I. 29, this court has recently decided that he is an officer appointed to perform a public service, and in appointing him the mayor and aldermen of a city merely exercised one of the functions of government in which the city had no special interest and from which it derived no special benefit or advantage in its corporate capacity. A city, therefore, in preserving the public peace or enforcing the laws within its borders, is not acting for itself or for its own inhabitants merely, but for the whole people; in other words, the state. * * * *People v. Common Council of Detroit*, 28 Mich. 228, involved the creation of a park commission, and again distinguishing the case from *People v. Mahaney*, 13 Mich. 481, the court held that the people of other parts of the state had no right to dictate to the city of Detroit what fountains it should build or what land it should buy for a park or boulevard, at its expense, for the recreation of its citizens. *People v. Mayor of Detroit*, 29 Mich. 343, was on the same subject. *Robertson v. Baxter*, 57 Mich. 127, related to the authority of a drain commissioner to act outside of his township. *Wilcox v. Paddock*, 65 Mich. 23, held that the legislature had no power to authorize a judge of probate of one county to assess benefits upon lands outside of his county for a local improvement. *Board of Metropolitan Police v. Board of Auditors*, 68 Mich. 576, held that the police commission of Detroit, paid for by the city, could not be assigned to duty in other townships. The Michigan cases therefore draw a clear line between local and state service."

The court makes this distinction plain by quoting the following from *Burch v. Hardwicke*, 30 Grat. (Va.) 24, 38 (32 Am. Rep. 640): "The distinction recognized in all of them is between officers whose duties are exclusively of a local nature and officers appointed for a particular locality, but yet whose duties are of a public or general nature. When they are of the latter character they are state officers, whether the legislature itself makes the ap-

pointment or delegates its authority to the municipality. The state, as a political society, is interested in the suppression of crime and in the preservation of peace and good order, and in protecting the rights of persons and property. No duty is more general and all-pervading than this. It extends alike to towns and cities as to the country."

In the case at bar we are dealing, not with police officers of cities, but with counties and their government. County governments are local in their nature, and the Constitution protects them in their right of local self-government. "The legislature shall provide by law for the election of such county and township officers as may be necessary." Const., art. X, sec. 4.

The Constitution makers had something definite in mind when they provided that county officers should be elected. If a statute should provide that the voters of one township should elect the county officers, that would not be the election that the Constitution intends. If one block of the city with perhaps 20 or 30 votes was constituted a voting precinct and empowered to elect one of five members of the county board, and the remainder of the county divided equally into the four districts with power to elect the four remaining members, this, of course, would not be the election intended. Counties are by the Constitution and statutes given control of their own local matters. No one outside of the county is vitally interested in these matters, and every one in the county is interested equally with all others. To give them unequal power in the local government of the county violates the constitutional right of representation as plainly and in the same degree as unequal representation in the state legislature or in congress would violate the constitutional right of representation in public affairs. The first section of article I of our Constitution declares that "all persons are by nature free and independent," and have certain inherent and inalienable rights and that governments derive "their just powers from the consent of the governed." The last section of

State, ex rel. Harte, v. Moorhead.

the same article declares that "all powers not herein delegated remain with the people." These provisions are characteristic of a republican form of government. If all power rests in the first instance with the people, and they delegate certain powers to certain of their representatives and retain all other powers, this distinguishes such a government from a monarchy or oligarchy. When the present Constitution was adopted county government had been established and the counties had been given a right to legislate upon certain local matters. This condition was assumed in our present Constitution, and, pursuant thereto, has been continued in elaborate legislative provisions. The principal of our Constitution of absolute equality in governmental matters is recognized in the legislation which requires that the great seal of the state shall contain the words "Equality before the law." It must follow that the legislature has no absolute and unlimited power to so distribute the control of county affairs that the voters in one of five districts of the county can control the affairs of the county. There appears to be no necessity in this case for unequal representation. There can be such number of districts in the county and those districts can be so appointed as to meet every legislative purpose, and at the same time give practically equal representation to all of the people. It is conceded that, if this smaller district had been divided into two districts, giving each of these two districts the power to select a member of the county board, and the remainder of the county divided into three districts with power to select only three members of the county board, the statute would be unconstitutional.

The courts have hesitated to attempt an exact definition of a republican form of government, but what constitutes equality before the law has been frequently considered. The supreme court of Kentucky said: "He has studied our Constitution in vain who has not discovered that the keystone of that great instrument is equality—equality of men, equality of representation, equality of burden, and

equality of benefits. Section 1 of the Bill of Rights provides: 'All men are by nature free and equal.'  *  *  *
Section 3: 'All men, when they form a social compact are
equal.'  *  *  *  Section 33 provides for equality of representation. Sections 171, 172, 173 and 174 provide for
equality of taxation (uniformity). Section 39 provides
for equality (general) of laws. Indeed, it could not be
otherwise, for, when our forefathers emigrated from their
European home, it was in the main to escape from the oppression of inequality. They brought with them a burning
love for this great democratic principle, and imbedded it
deep in the foundation of the empire they were destined
to erect, and which they will preserve so long as the love
of liberty is more than a name. When they threw off
the supervising government of the mother country, it was
because they were denied equality of representation; or,
as they then expressed the evil, they had imposed upon
them taxation without representation. Equality of representation is a vital principle of democracy. In proportion as this is denied or withheld, the government becomes oligarchical or monarchical. Without equality republican institutions are impossible. Inequality of representation is .a tyranny to which no people worthy of
freedom will tamely submit. To say that a man in
Spencer county shall have seven times as much influence
in the government of the state as a man in Ohio,
Butler, or Edmonson, is to say that six men out of every
seven in those counties are not represented in the government at all." *Ragland v: Anderson,* 125 Ky. 141, 160 (128
Am. St. Rep. 242).

In the same opinion the court said: "It is not insisted
that the equality of representation is to be made mathematically exact. This is manifestly impossible. All that
the Constitution requires is that equality in the representation of the state which an ordinary knowledge of its
population and a sense of common justice would suggest.
We have not been referred to a more accurate or better
description of the equality required by the Constitution

than that contained in the report of Daniel Webster, as chairman of a senatorial committee engaged in a duty similar to that involved in the act under discussion: 'The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring congress to make an apportionment of representatives among the several states, according to their respective numbers, as nearly as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made.' "

The supreme court of Michigan used similar language: "It was never contemplated that one elector should possess two or three times more influence, in the person of a representative or senator, than another elector in another district. Each, in so far as it is practicable, is, under the Constitution, possessed of equal power and influence. Equality in such matters lies at the basis of our free government." *Giddings v. Blacker*, 93 Mich. 1.

It was suggested, on the one part, that the object of this legislation was to give the farmers in the outlying districts adequate representation on the board, and, on the other part, it was suggested that the motive was to remove this relator from the board where he had been a member, and to prevent the selection of a farmer residing within two miles of the city limits. This court will not inquire into nor consider the motives that may have actuated the legislature.

"There is no difficulty in making an apportionment which shall satisfy the demand of the Constitution. It is not the purpose or province of this court to inquire into the motives of the legislature. Courts will not discuss the motives of legislative bodies, except as they appear in the public acts or journals of such bodies. The validity of an act does not depend upon the motive for its passage. The duty of a court begins with the inquiry into the constitu-

tionality of the law, and ends with the determination of that question." *Giddings v. Blacker, supra.*

"In so far as a legislature keeps within the limits of powers in enacting laws its motives cannot be inquired into, and its discretion is not a subject for review in the courts; but whenever and to the extent that it transcends its powers, it is conclusively presumed that it intended to so transcend them, and parol evidence of good motives or other considerations are not allowed to obviate the effect of such unlawful intent. * * * Nor is evidence admissible, in support of such apportionment, to show that one district, with a less population than another, was given the same representation because of the excessive assessed valuation of property therein, and the nature and character of its population and business interests. The legislature has no power to disregard the standard of apportionment as fixed by the Constitution." *State v. Cunningham,* 35 Am. St. Rep. 27 (83 Wis. 90).

All voters are equal before the law. The Constitution will not permit one class of voters to be given more power to determine the government than is given another class. If the purpose is to give adequate representation upon the board to the farming interests, no reason is perceived why it could not be done in this case without violating a fundamental principle of our form of government by giving one class of voters more power in the government than is given to another class. Since perfect equality is impracticable, there is no doubt that the legislature may exercise a reasonable discretion in selecting the method of securing practical equality.

The supreme court of Illinois discussed at large the limits of legislative discretion in such cases in *People v. Thompson,* 155 Ill. 451, 481, and it was there held that, while the question whether the constitutional requirements have been applied at all is a question for the courts, the question "whether or not the nearest practicable approximation to perfect compactness and equality has been attained is a question for the legislative discretion."

It was also said: "Only a reasonable approximation toward equality is essential, under the requirements of the Constitution that senatorial districts shall contain, as nearly as practicable, an equal number of inhabitants." The court said: "The apportionment as made by the act of 1893 does not make the districts vary as much in population as from a fifth below to a fifth above the ratio. Here is a wide latitude, in a populous state, for inequality, it must be admitted; and we do not mean to say that the legislature could have arbitrarily formed a district containing simply the constitutional minimum of four-fifths, and another district adjoining with one-fifth or more above the ratio, when, by taking a county from the larger and adding it to the smaller district, greater equality in population and compactness of territory could have been secured, for in such case it might perhaps be said that the principles of compactness of territory and approximate equality in population, above the minimum, had been disregarded and not applied at all by the legislature."

From this it appears that that court was not considering a case in which one district had less than one-third of the population of any other district, and clearly that court would have considered that in such an apportionment "equality in population, above the minimum, had been disregarded and not applied at all by the legislature." It is clear that in the statute we are considering the legislature has arbitrarily divided this county into districts without any regard whatever to equality in population of the district, and it must be considered that the controlling principle of equality before the law has not been applied at all. In this view of the case, the statute is unconstitutional and should be disregarded. The writ is

ALLOWED.

Morrissey, C. J., dissenting.

I dissent from the majority opinion because no provision of our Constitution has been pointed out to which the act does violence, and it is the duty of the court to sustain

every law which does not clearly violate the provisions of the Constitution. There is no provision in our Constitution directing that counties shall be divided into commissioner districts, or determining that such an office as county commissioner shall be created. The whole field as to what county officers shall be elected, and how they shall be elected, and from what territorial divisions, is left entirely to the legislature. We have long recognized the wisdom of dividing counties into districts, and in overthrowing this act the majority opinion repudiates the very policy it purports to support. While the act requires the commissioners to be chosen from districts, they are elected by the entire electorate of the county.

A few general principles of constitutional law should be kept in mind in considering this question.

A fundamental principle announced in *Hallenbeck v. Hahn*, 2 Neb. 377, is: "The Constitution of this state confers plenary legislative power upon the general assembly; and, if an act is within the legitimate exercise of that power, it is valid, unless some express restriction or limitation can be found in the Constitution itself."

In the same case it was said (p. 397) : "This doctrine is elementary, is cardinal, and arises out of the very nature of our form of government. With us, sovereignty resides with the people. Were they acting as a whole for themselves, there can be no doubt but this, or any other law that should receive a majority sanction, would be conclusive. But, parceling out the exercise of their sovereign power to the three departments of government—the legislative, the executive, and the judicial—to the first has been committed, except what has been abandoned to the congress of the United States, the exercise of the whole sovereign law-making power as completely and absolutely as possessed by the people, subject only to such limitations as the people may have chosen to impose. These limitations are set out in the state Constitution."

The constitutional provision quoted in the majority opinion that "all powers not herein delegated are reserved

to the people," instead of being, as indicated by the opinion, a limitation upon the legislature, is a positive affirmation that, unless restrained by constitutional limitations, the people, acting through their legislature, are free to enact any law they deem desirable.

Where no limitation is expressed in the Constitution, "The framers of the Constitution relied for protection in this regard upon the wisdom and justice of the representative body and the accountability of its members to the people, rather than the restraining power of the courts of law. It is said that 'the courts can enforce only those limitations which the Constitution imposes, and not those implied restrictions, which, resting on theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives.' Cooley, Constitutional Limitations, 129. *State v. McCann,* 21 Ohio St. 198, 210." *State v. Board of County Commissioners,* 4 Neb. 537.

It is also well settled that "A legislative act should not be declared unconstitutional, unless it is so clearly in conflict with some provision of the fundamental law that it cannot stand." *State v. Nolan,* 71 Neb. 136.

Has the act under consideration been shown to be "so clearly in conflict with some provision of the fundamental law that it cannot stand?" Relator contends that the act violates section 4, art. IV of the United States Constitution, which provides that congress shall guarantee to every state a republican form of government. The opinion discusses at some length the nature of a republican form of government. This is a political question, and is beyond the jurisdiction of the judiciary. *Pacific States Telephone & Telegraph Co. v. Oregon,* 223 U. S. 118. "There does not seem to be any case which is authority for the proposition that an act of the legislature of the state, with a republican form of government and so recognized by congress, can be held invalid under the provisions of article IV, sec. 4 of the Constitution." *Susman v. Board of Public Education,* 228 Fed. 217.

In discussing the nature of a county, in *Board of Commissioners v. Mighels,* 7 Ohio St. 109, 119, it was said: "A municipal corporation proper is created mainly for the interest, advantage, and convenience of the locality and its people; a county organization is created almost exclusively with a view to the policy of the state at large, for purposes of political organization and civil administration, in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport, and especially for the general administration of justice. With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy."

In its control over the governmental agencies of the state, known as counties, wherein is the legislature limited by the Constitution? The Constitution provides: "The legislature shall provide by law for the election of such county and township officers as may be necessary." Const., art. X, sec. 4. Under this provision the legislature could not provide for the appointment of county officers. While the Constitution directs that the legislature shall provide by law for the election of county officers, it has seen fit not to restrain the legislative discretion as to the number of county officers, their duties, their terms of office, nor their qualifications. Wherein does an act providing for the election of county commissioners from districts into which the county is divided violate any constitutional provision? If the legislature has the power to provide that county commissioners shall be chosen from districts, has not the Constitution left the legislature free to exercise its own discretion in the matter? While not denying the authority of the legislature to create commissioner districts, the majority opinion holds that the legislature, in doing so, must not do violence to the principle of "equality of representation," and cites *People v. Thompson,* 155 Ill. 451, *State v. Cunningham,* 83 Wis. 90,

*Giddings v. Blacker*, 93 Mich. 1, and *Ragland v. Anderson*, 125 Ky. 141. In these cases acts of the legislature dividing the state into legislative districts of unequal population were held unconstitutional, but an examination of these cases shows that in each state the Constitution provided that the districts should be divided "according to population," or should contain, "as nearly as practicable, an equal number of inhabitants." No such constitutional provision has been shown to limit the legislature in this case.

The majority opinion quotes the discussion of the Kentucky court in *Raglan v. Anderson, supra,* upon the principles of "equality." The Kentucky Constitution expressly provided that the state should be divided into senatorial and representative districts "as nearly equal in population as may be." Since that decision the Kentucky court has held that, where a city council has authority to divide the city into wards and provide for the election of councilmen, "there being no constitutional or statutory provision requiring that such division be so made as to provide equal representation, the courts cannot interfere with the exercise of the legislative power so conferred by invalidating an ordinance so dividing the city into wards as to cause unequal representation." *Moore v. City of Georgetown*, 127 Ky. 409. In an opinion containing a full discussion of the question, the court, among other things, said:

"It is true that fair representation and equal apportionment is a valuable privilege, and one that should be adhered to; but, when the legislative department of the state that created these municipalities and provided an elaborate plan for their government failed to adopt either directly or by implication any scheme to regulate or control them in the selection of their legislative boards, we do not feel that the courts are warranted in interfering with the discretion lodged in the people of these cities and their representatives whose duty it is to divide the city into wards. So far as our examination extends, in every in-

stance in which the judiciary has undertaken to interfere with the legislative department of the state or its municipalities in the power of apportionment and representation authority direct or by implication has been found in the Constitution or the statutes. * * * Whilst the division of Georgetown into wards by the council and the allotment of representation is apparently unfair and unequal, we do not feel disposed to adjudge that it exceeded the power granted. Nor can we hold that it violates any fundamental principle of government."

In *Richardson v. McChesney,* 128 Ky. 363, the Kentucky court also held: "A legislative apportionment of the state into congressional districts cannot be judicially reviewed, in the absence of a constitutional provision controlling apportionment." In the opinion the court said: "Except when limited by the Constitution of the state, the general assembly, especially in administrative and political affairs, is beyond the reach of the judiciary of the state. We have no authority to pass judgment upon its acts. In no case that has come under our notice have the courts undertaken to attempt to restrain the legislative departments, unless it violated some provision of the organic law of the state. * * * But in the matter of congressional districts we find nothing in our state Constitution to guide us. There is nowhere any limitation upon the power of the legislature, and it would be assuming authority this court does not possess if we undertook to control a coordinate department of the government in the performance of a power vested exclusively in it. It is not for the judiciary to question the policy, expediency, or propriety of laws enacted by the general assembly, unless they conflict with the Constitution."

In Tennessee, where the Constitution provides for the election of justices of the peace in districts of the counties who shall constitute the county board, it was held that the court would not interfere with the action of the legislature in redistricting a county, "though the districts as laid off in the statute are disproportionate in area, wealth, and

State, ex rel. Harte, v. Moorhead.

population, and of shape inconvenient to their inhabitants." *Maxey v. Powers,* 117 Tenn. 381. In the opinion the court said (p. 392) : "The general rule is that where one of the departments of the state is vested with a power, to be exercised when and in such manner as those charged with its exercise may consider expedient and proper in its discretion, the action of the department cannot be interfered with by any other department. This is especially so in matters of a political character. * * * (p. 398) The general assembly had the exclusive and absolute power to lay off Knox county into civil districts. How it should execute this power was for it to determine. It must be assumed that it had the proper data and information before it to do so intelligently, and that the districts created by it are of convenient size for their primary purpose, the efficient administration of the law in the county, and also in the interest and for the good of the people affected. The courts have no jurisdiction to inquire into these matters, and the civil districts must stand as laid off by the act, until it is repealed or amended by the legislature."

The Constitution of Michigan provides: "A board of supervisors, consisting of one from each organized township, shall be established in each county. * * * Cities shall have such representation in the board of supervisors of the counties in which they are situated as the legislature may direct." The legislature provided that the president of the village of Mackinac should be a member of the board of supervisors. This was claimed to violate the quoted provisions of the Constitution. It was argued that this act allowed a village to have the same representation on the board as a city, and, further, that the act provided for more than one supervisor from each township. The court held the act valid, and said: "The necessity for the enactment of the statute becomes most apparent in the case of this village, when we take into consideration its geographical position with reference to other portions of

99 Neb. 35

the county in which it is located. It is situated on two islands about five miles from the other portions of the territory of the county, and for several months in the year access with the mainland becomes exceedingly difficult. Its business interests, to a great extent, are such as have but little connection with those of the other portions of the county; and its property depends largely for its value on considerations which do not affect the remainder of the county. It seems to be entirely proper that its interests should be specially represented on the board which apportions the taxes to be paid, on its property holders, and whose action continually, more or less, involves its local interests." *Attorney General v. Preston,* 56 Mich. 177.

In *Redell v. Moores,* 63 Neb. 219, the doctrine on which the majority opinion is based, previously announced by this court in *State v. Moores,* 55 Neb. 480, that an act might be unconstitutional as being in violation of the spirit of the Constitution, was definitely set aside. Speaking of the decision in *State v. Moores, supra,* it was said by Judge Sullivan, in *State v. Kennedy,* 60 Neb. 300, that, if the view that the spirit of the Constitution may be invoked to declare a law invalid "is to be acquiesced in and accepted as a rule of construction, the Constitution of the state is to be fully known only by studying the theories of the judges who are chosen to expound it; it will expand or contract with every fluctuation of the popular will which produces a change in the personnel of the court; and the limitations upon legislative power will be as unknown and unknowable as were the rules of equity in the days when the chancellor's conscience was the law of the land."

The wisdom of the act is not for the court to determine, although it clearly appears that there is good reason for its enactment. The policy of dividing the county into districts is based on the supposition that members of the board ought to be familiar with the local needs of their constituents; that they ought to be in close touch with

those they are elected to serve and whose business they administer. This act is designed to provide representation for the rural district, where the avocations of the people are different from those within the metropolitan city. While there are fewer voters in the rural district, they are scattered over a much wider territory, and their interests are more diversified. There are many miles of road within this district, and there are many bridges. These roads and bridges come within the jurisdiction of the board. Members of the board living within the metropolitan city, enjoying the advantages of paved streets, strangers to the vicissitudes of country life, may not be so ready to respond to the needs of this particular class as one who maintains his home among them. Then again, *per capita*, this district may represent a much greater proportion of the taxable property of the county than a district of greater population within the metropolitan city, where large numbers of voters possess no property and contribute nothing to the support of the county.

The majority opinion is an unwarranted invasion of the power vested exclusively in the legislature, and cannot be reconciled with the provisions of our Constitution.

LETTON and ROSE, JJ., concur in this dissent.