**LEAGUE OF NEBRASKA MUNICIPAL-ITIES a non-profit Nebraska corporation, et al., Plaintiffs,**

**v.**

**Frank O. MARSH, as Secretary of State of the State of Nebraska and as Member of the State Board of Education Canvassers of the State of Nebraska, et al., Defendants,**

**Nebraska State American Federation of Labor and Congress of Industrial Organizations et al., Intervenors.**

Civ. 551 L.

United States District Court
D. Nebraska.

May 12, 1965.

Dissenting Opinion June 4, 1965.

Johnsen, Circuit Judge, dissented.

See also 209 F.Supp. 189, 232 F. Supp. 411.

Ralph D. Nelson, Lincoln, Neb., and Herbert M. Fitle, Omaha, Neb., for plaintiffs.

Robert A. Nelson, Sp. Asst. Atty. Gen., of Nebraska, and Richard H. Williams, Asst. Atty. Gen., of Nebraska, for defendants.

August Ross and Robert E. O'Connor, Omaha, Neb., for intervenors.

Before JOHNSEN, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

PER CURIAM.

This case has been before the Court upon three previous occasions. Opinions were filed setting forth the Court's views, 209 F.Supp. 189, 232 F.Supp. 411, and an unpublished opinion dated March 3, 1964. It is therefore unnecessary to recite here the background of this case or to restate the issues previously decided. We have continued to retain jurisdiction of the case.

The matter is now before us upon the supplemental answer and counterclaim filed by the Attorney General of Nebraska, on behalf of the defendant elective and appointive officers. It is alleged by the defendants, and admitted by the plaintiffs and the intervenors in their reply, that the Legislature of Nebraska in its 75th session duly passed a legislative reapportionment bill, Legislative Bill 628, with an emergency clause as a part thereof, and that it was signed by the Governor of Nebraska on March 29, 1965.

The pleadings raise the question now for decision by this Court whether L.B. 628, mentioned above, meets the standards outlined in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 [1962], and subsequent decisions of the United States Supreme Court for a constitutionally valid legislative reapportionment plan. We hold that it does not.

L.B. 628 increases the Legislature to 50 members, which is the maximum provided for in Article III, Section 6, of the Nebraska Constitution.

Of the 50 districts created by this bill, 21 are identical in boundaries and population with districts created under the 1963 enactment, which this Court held unconstitutional. Douglas County, in which

the City of Omaha is situated, will have 12 legislators. This is two more legislators than were provided in the 1963 act. Lancaster County, in which the City of Lincoln is located, is again provided with 5 legislators. The boundary changes in the remaining 12 districts are relatively minor and will not be commented upon individually.

We turn to the claimed inequality in population. L.B. 628 creates one district, Number 35 [Hall County], with a population of 35,737.[1] The smallest district created, number 44, has a population of 22,301. Thus one vote in district Number 44 is the equivalent of 1.6 votes in district Number 35.

The 10 smallest districts under this bill, which range in population from 22,301 to 24,287, have a total population of 235,705, or an average population of 23,571. These 10 districts are thus afforded 10 legislators when they are entitled to 8 on a population basis and to 6 on the basis that Hall County is entitled to 1. These 10 legislative districts are generally in the area which benefited most under the area amendment previously held unconstitutional. The 7 smallest districts with a population of 162,851 are afforded under this act 7 legislators while Lancaster County, with a population of 155,272, is afforded 5 legislators

Moreover, 5 districts created by L.B. 628, districts Number 2, 15, 30, 35, and 48, exceed the average population per district by over 15% and 6 districts created by the act, districts Number 40, 42, 43, 44, 46, and 49, are more than 15% below this average. Thus 11 of the 50 districts do not fall within a 15% variation which has been discussed in the United States House of Representatives as a permissible variation in that body. By this reference this Court is not saying that it approves such a variation, or that the House of Representatives has or will approve it. It is mentioned because it points out the range of inequality of representation in L.B. 628.[2]

The act certainly had the effect of reducing the inequality previously pointed out in Douglas County, but it did not rectify the inequalities elsewhere.

The doctrine of "one person-one vote" is not new in Nebraska. The Supreme Court of Nebraska in State ex rel. Harte v. Moorhead, 99 Neb. 527, 156 N.W. 1067, laid down this principle years ago:

"Under our Constitution all government derives its 'just powers from the consent of the governed' [Article 1, § 1], and the principle of 'equality before the law' requires that every voter shall, as far as practicable, have an equal voice in the affairs of government. [Syl. 4]

"It is not required that equality of representation shall be mathematically exact. But the apportionment of representatives of the people in any government body must be according to the population represented as near as may be." [Syl. 6]

The Nebraska court further said:

"To give them unequal power in the local government of the county violates the constitutional right of representation as plainly and in the same degree as unequal representation in the state Legislature or in Congress would violate the constitutional right of representation in public affairs. * * * The principle of our Constitution of absolute equality in governmental matters is recognized in the legislation which requires that the great seal of the state shall contain the words 'Equality before the law.' * * * All voters are equal before the law. The Con-

---

1. On the basis of 50 legislators and a total Nebraska population of 1,411,330 in 1960, the average district would consist of 28,226 people if each were mathematically exact.

2. The Court acknowledges that the 15% variation test may not be entirely analogous in the present case inasmuch as the reapportionment imperative for the House of Representatives is balanced off by the organization of the Senate on an entirely different basis, while the Nebraska legislature is, of course, unicameral.

stitution will not permit one class of voters to be given more power to determine the government than is given another class."

This principle has stood unchanged and unchallenged for nearly 50 years. The previous opinions of this Court, in applying Baker v. Carr, supra, and other decisions of the United States Supreme Court have not announced any principle of representation not expressed in substance 49 years earlier by the highest court of Nebraska.

■ Two practical problems appear. It was stated by one State Senator who, as disclosed by the record, was influential in the drafting and passage of the present bill, " * * * You could go, you have another approach, you could go to around 32,000 average but you will do away with about 4 or 5 senators of the present senators serving." The goal of reapportionment, however, is just representation of the people, not the protection of incumbents in a legislative body.

The second problem arises because, if county lines are to be followed, it is apparent that mathematical exactness cannot be had. It does not follow, however, that greater exactness cannot be had than is furnished by L.B. 628. If county lines are to be followed by the Legislature, then new districts must be formed using Hall County as a median; provided, however, that they do not impinge upon the rights of voters of Hall County.

Whether more than 39 or 40 districts, which is the approximate number which could be created using Hall County as a median, can be formed providing for "population represented as near as may be" we need not decide. However, it is proper, in view of the unsuccessful efforts of the 1963 and 1965 Legislatures to adopt a constitutionally valid plan, to state our conclusion that *if county lines are to be followed* a legislature of 49 or 50 districts is an impossibility as a constitutionally valid legislative reapportionment plan.

The Court further observes that by providing for a lesser number of legislative districts than proposed in either 1963 or 1965, districts following county lines can be created with greater mathematical exactness than are contained in L.B. 628. By this reference we are not giving prepassage approval to any proposal brought to the attention of the Court. We are only rejecting the contention that L.B. 628 is the best or the fairest plan that the Legislature can devise.

We have considered the opinion in Lucas v. Colorado General Assembly, 377 U. S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632, indicating that a maximum population variance ratio of 1.7 to 1 is at least arguably apportioned substantially on a population basis. If there were no redistricting plan other than L.B. 628 which could be devised following county lines, the 1.6 to 1 ratio present thereunder might arguably be permissible, conceding the correctness of two claims, which are unnecessary to be decided here, first, the Attorney General's ruling that counties cannot be divided, except where the county is entitled to more than one legislator, and, secondly, that some good reason exists for respecting county boundaries in the selection of legislators, even though school districts, power districts, towns and cities and many other governmental bodies created under enactments of the Legislature do not respect them.

■ The determinative factor, however, is that the situation does not bear out the claim of the supporters of L.B. 628 that it is the best plan which possibly could be devised. Under the teaching of the reapportionment cases, each plan must be examined on its own merits. In footnote 27, Lucas, supra, at page 735, 84 S. Ct. at page 1473, we read:

"Consistent with this approach, in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole. Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites

of the Equal Protection Clause. Deviations from a strict population basis, so long as rationally justifiable, may be utilized to balance a slight overrepresentation of a particular area in one house with a minor underrepresentation of that area in the other house. But, on the other hand, disparities from population-based representation, though minor, may be cumulative instead of offsetting where the same areas are disadvantaged in both houses of a state legislature, and may therefore render the apportionment scheme at least constitutionally suspect."

We recognize the unique organization of Nebraska's legislature. But in considering the constitutionality of L.B. 628, the Court cannot accept the degree of deviation from the population basis as rationally justifiable without defeating the purpose of reapportionment.

One of the plans proposed to the Court [a 43 district plan] has a maximum population variance ratio of 1.39 between the most populous and the least populous district. The Court has considered other possible apportionment plans in reviewing the validity of L.B. 628 and found at least three alternatives which are more proportionate than this plan. In one plan Nebraska can be divided into 37 districts following county lines and have a maximum population variance ratio of approximately 1.26 between the smallest and the largest districts.

There are several other features in this case that weigh heavily against permitting a population variance ratio of 1.6 to stand. For example, as indicated above, the ten smallest districts have two more legislators than they are entitled to on a population basis. These counties could be grouped into eight districts with only slight modifications in other districts.

■ Considering the plan in its totality and the record as a whole, it is apparent that the districts have been created to facilitate keeping present members in office and, except in one district, to provide boundaries that will keep the present members from having to contest with each other at the polls. When such factors enter into reapportionment, it cannot be said, using the language of Lucas, supra, that "a good faith effort to establish districts substantially equal in population has been made."

The cumulative effect of all these disparities from population-based representation lead the Court to conclude and hold that L.B. 628 is not a constitutionally valid reapportionment plan.

■ The Court declines to formulate a plan of reapportionment in this case. If the Legislature before adjournment of its present regular session does not adopt a constitutionally valid legislative reapportionment plan, the Court will order that all the members of the Legislature be nominated and elected at large in the State of Nebraska at the elections of 1966.

We continue to retain jurisdiction for the entry of any further orders that are necessary.

JOHNSEN, Circuit Judge (dissenting).

I respectfully differ with the result reached by Judge Van Pelt and Judge Robinson, but because of preoccupation with a Court of Appeals' session, I am without the time immediately to prepare a memorandum of full expression. It is, however, important that there should be no delay in enabling the Legislature to face the problem presented by the court's decision. I accordingly merely note my dissent, reserve the right to file fuller expression later, but acquiesce in the immediate entry of judgment.

JOHNSEN, Circuit Judge (dissenting).

At the time the Court's opinion was filed, I noted my dissent and reserved the right to make further expression as soon as time became available to me to do so.

I engage in this expression, not in any commendation of the reapportionment

plan which is involved, but simply to indicate my doubt that it is so lacking in rationality or is of such unfairness realistically as to require it to be held a constitutionally impermissible job and result. Entertaining doubt as I do that the Legislature's action is clearly unconstitutional, I should be lacking in judicial responsibility if I voted to declare it so.

We were all without any doubt that the previous reapportionment plan was fundamentally invalid, since it made land acreage or area a substantial factor of representational basis and weight of voting rights. The present plan has made increase in the number of legislative districts from 49 to 50, and it has engaged in territorial realignments so that population adjustments have occurred in 28 of the former 49 districts.

These have been adjustments both of increase and reduction. For example, what is now District No. 18 has had its population increased from 22,030 to 27,813, and District No. 1 has had its population reduced from 34,639 to 28,359. Similarly, as to the districts in which no territorial change has been made, these again have not been population divisions of a single class, as being either all above or all below [some of each kind are involved] the 28,226 number of which the mean or "ideal" district for a 50-seat Nebraska Legislature would consist, on a strictly mathematical basis.

What I am noting in relation to this is that the Legislature has chosen to make its structure consist of 50 members, as it had the right to do under Sec. 6 of Art. III of the Nebraska Constitution; that in setting up districts to provide for this structure, it has engaged in taking single counties and groups of contiguous counties so as to keep all districts within county lines; that this has been done, as the legislative history shows, because of the opinion of the Attorney General of the State that if it did not adhere to county lines it would be violating the provisions of Sec. 5 of Art. III of the Nebraska Constitution; and that insofar as its action is entitled to be based upon these aspects and considerations, the job and

result are probably as close in representational division as it is practicably possible to come [there has been no demonstration to the contrary].

I should not, of course, expect the members of a Legislature to be without a personal concern about what a reapportionment plan would do to them. I do not believe, however, that it is entitled to be found that the primary motive and purpose of the plan before us have been to facilitate keeping present members in office and to provide boundaries that would avoid their having to contest with each other at the polls. There is implicit in the choice of a 50-member structure over one of 39 or 40 a rationality that extends beyond a possible element of self-interest and that is entitled to recognition accordingly. In the vast volume of bills which the single-chambered Nebraska Legislature has been called upon to process in its last sessions, I can readily understand its desire and need to have more than 39 members to carry the heavy load of essential committee work. And I should be willing to predict that on this basis it is not likely to come forth with a 39 or 40-member structure, in whatever effort it may further engage to formulate a reapportionment plan.

But I do not regard these aspects of any particular significance here. Whether the reapportionment plan involved is invalid must, I think, be resolved on the basis of its representational results, examined in relation to any margins of flexibility or variance allowed existence on the basis of state policy, and with the situation then weighed in its whole as a question of whether there is such lack of rationality or such gross unfairness, on extent, basis or consequence of classes created, as to require a holding of general invidious discrimination.

This is at least where Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, began. Thus the Court's opinion stated: "Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the par-

ticular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action". 369 U.S. 226, 82 S.Ct. 715. And the concurring opinion of Mr. Justice Douglas emphasized: "Universal equality is not the test; there is room for weighting. * * 'The prohibition of the Equal Protection Clause goes no further than the invidious *discrimination*'". 369 U.S. 244–245, 82 S.Ct. 724. The concurring opinion of Mr. Justice Clark was similarly express in its declaration that a statutory discrimination will "not be set aside if any state of facts reasonably may be conceived to justify it. * * * Only where * * * the total picture reveals incommensurables of both magnitude and frequency can it be said that there is present an invidious discrimination". 369 U.S. 253 and 260, 82 S.Ct. 729 and 733.

I am aware, of course, that the series of decisions, commencing with Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, handed down in June 1964, are viewed by legalistic reapportionment enthusiasts as having left the question of discrimination a matter simply of mathematical computation, subject only to *de minimis* allowance in variation. This is, no doubt, what the slogan "One person, one vote" has come to imply in street interpretation. It is to be noted, however, that the Supreme Court made the observation in Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 727, 730, 84 S.Ct. 1459, 1469, 1470, 12 L.Ed.2d 632, the last of the series of June 1964 reapportionment decisions, that a maximum population-variance ratio of approximately 1.7 to 1 between the most populous and least populous districts for the Colorado House of Representatives could prehaps arguably constitute an apportionment substantially on a population basis in its relation to the entire situation there involved. It added that "in determining whether a good-faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole". The Court further

took occasion to remind that in determining whether a good-faith effort to establish districts equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole. "Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites of the Equal Protection Clause". 377 U.S. 736, footnote 27, 84 S.Ct. 1473.

To me, there would seem to be a sound basis for recognizing a margin of population variance of some flexibility in order to allow a State to adhere to its policy of keeping legislative districts within county lines. The county has traditionally been the unit of the strongest and most immediate common ties (tax, road, school, welfare and other interests) in almost all of Nebraska. And what is sought by the voting right for electing legislators is ordinarily the obtaining of representation as to these interests or as to other group or class ties which have come to exist. Thus, as I have indicated, there properly can be room, it seems to me, for more than a mere nominal population variance between districts in allowing such composites to make their majority expression on this natural and compact basis.

When this law suit began, its theory and contention were held out to us as being that a voting imbalance had come to exist between urban and rural interests. Looking at the matter analytically, however, the fact is that Nebraska contains only 11 cities of over 10,000 population [merely three above 25,000] and only 13 more that are over the 5,000 mark. Scrutinizing the geographical location of the 13 cities in the 5,000 class and their status and relationship in the counties of which they are a part, it seems to me that most of them dominatingly have the same general interests as the rest of the county in their legislative concerns. The battle cry of urban-versus-rural representation would, with possibly two or three exceptions, be of faint voice as to them.

Thus, if the urban-versus-rural issue has any substance as to reapportionment in Nebraska, I think it gets down to the 11 cities of over 10,000 population. On the basis of mean standard, the population of these cities would aggregately be entitled to vote for 20.5 representatives. The cities are parts of districts which elect 26 representatives. The seven largest of them constitute a majority of the population in each of the districts of which they are a part so that the election of the 22 representatives, which come from these districts, would be able to be controlled by them. With their power to control the election of 22 representatives as against a mean right otherwise to vote for only 20.5 representatives, they can hardly be said to have suffered invidious discrimination in legislative strength as a question of urban representation.

Looking at the other side of the question, on the representation of rural interest in such counties as Hall, Scotts Bluff and Dodge, which have a population over the mean but with an urban majority, I am sufficiently steeped in the facts of Nebraska life to feel certain that the excess-over-mean inhabitants of these single-county districts would not representationally desire to have a sliver-joinder made of them to some adjoining counties as against their present less-than-mean right to vote for a legislator from their own county. I might further say that I am equally sure that the approximately 2,000 excess above the mean which there are in each of the five Lancaster County Districts would similarly choose to allow their voting right and representational strength to remain as it is in preference to being tied to and having their lot cast with the residents of either Saunders, Seward or Saline County.

There are other practical considerations which enter into my lack of persuasion that the reapportionment plan is, on realistic viewing of its structural form and operational effect, invidiously discriminatory and hence unconstitutional. I shall, however, forego further discussion both for the sake of brevity and because this expression is not intended to serve any purpose beyond satisfying my own conscience. I therefore simply repeat that I am not persuaded that the plan is of such imbalance, as to constitute gross unfairness or invidious discrimination, as between urban and rural interests or between any other population groups, segments and classes. I would permit Nebraska to live with its plan until the 1970 census has been taken and reported, making the recognition thus accorded subject to the condition that the Legislature should at that time make re-examination of the situation, and that if it failed to engage in such a consideration application would be entitled to be made here for any relief to which the population number and distribution might then demonstrate a right.

I shall take the liberty of volunteering a word on the problem with which the Legislature is faced under the Court's decision. Obviously, to maintain a 50-member body, county lines will have to be crossed in order to equalize population disparities. If the results are to be mechanically tested by arithmetical comparison, then there can be but slight room for any deviation, since it is, of course, possible to run political lines up the middle of an alley, down a quarter-section line, or meanderingly across hay fields and grazing lands. Thus, results can be produced which are numerically equal, absolutely or except miniscutely. I had hoped that the problem of reapportionment would not get to this level, since ultimately, when the glamor has faded from the slogan "one person, one vote", the citizen will ask whether what has been done for him has also provided him with fair representational opportunity.