In the Matter of the LEGISLATIVE DIS-TRICTING OF the GENERAL ASSEM-BLY of Iowa as Enacted By the 63rd General Assembly (House File 781).

Clark R. RASMUSSEN, Margaret A. Schroeder, Willie J. O'Neal, Jacky L. Adams and Robert W. Burke, Applicants,

Robert RAY, Governor, Richard C. Turner, Attorney General, Melvin Synhorst, Secretary of State, Carrol Lane, Secretary of the Senate of the 63rd G. A., and William Kendrick, Chief Clerk of the House of Representatives of the 63rd G. A., Respondents.

No. 53764.

Supreme Court of Iowa.

Feb. 10, 1970.

Harry M. Smith, Sioux City, Dan Johnston, Des Moines, for applicants.

Richard C. Turner, Atty. Gen., Elizabeth A. Nolan, Asst. Atty. Gen., and Richard E. Haesemeyer, Sol. Gen., for respondents.

MASON, Justice.

This is an original proceeding before this court to review the constitutionality of the apportionment of Iowa's legislature under chapter 89, Acts of the Sixty-third General Assembly. This chapter, referred to in the record as House File 781, apportions the Senate and House of Representatives membership of the General Assembly for the 1970 elections.

Article III, section 34, of the Iowa Constitution, as amended November 5, 1968, provides:

"The senate shall be composed of not more than fifty (50) and the house of representatives of not more than one hundred (100) members. Senators and representatives shall be elected from districts established by law. Each district so established shall be of compact and contiguous territory. The state shall be apportioned into senatorial and representative districts on the basis of population. The general assembly may provide by law for factors in addition to population, not in conflict with the constitution of the United States,

which may be considered in the apportioning of senatorial districts. No law so adopted shall permit the establishment of senatorial districts whereby a majority of the members of the senate shall represent less than forty (40) percent of the population of the state as shown by the most recent United States decennial census."

Following this amendment the Sixty-third General Assembly enacted chapter 328:

"A joint resolution to establish a commission to conduct a study of the apportionment of the General Assembly and to make recommendations to the General Assembly, and stating principles for the study and providing for legislative action."

This chapter referred to in the testimony as S.J.R. 5 (Senate Joint Resolution 5) became effective on publication January 30, 1969.

Section 1 created a 14-member commission to be composed of persons selected by the state chairmen of each of the two largest political parties in Iowa from residents of each of the seven congressional districts.

Section 2 provided for organization of the commission; authorized it to hold hearings, employ technical assistance and consult with representatives of political parties and groups.

Section 3 afforded these guidelines for the commission:

"On or before March 15, 1969 if possible, and in any event no later than April 1, 1969, the commission shall file in the office of the secretary of state an apportionment plan which shall be consistent with the following principles:

"a. There shall be one hundred representative districts and fifty senatorial districts. Each district shall be a single-member district.

"b. Both houses shall be apportioned on a population basis as shown by the 1960

United States decennial census. Districts shall be of substantially equal population and shall be of compact and contiguous territory, as required by the Constitution of the state of Iowa and the Constitution of the United States.

"c. Each senatorial district shall consist of two entire representative districts.

"d. No voting precinct shall be divided in forming a district.

"e. District boundaries shall follow county boundaries wherever possible, subject to constitutional requirements and the other principles stated in this section.

"f. Wherever possible, senators shall be permitted to complete the terms for which they were elected. Any senator elected in 1968 for a four-year term, and who is the only senator residing in his district under the apportionment plan, shall be permitted to complete his term. If two or more senators reside in the same senatorial district under the plan, that district shall elect a senator in the 1970 elections and terms shall be shortened where necessary to permit such election."

Section 4 retained for the General Assembly freedom of action to either adopt the commission's plan, modify it or adopt a plan of its own.

The act further provided that any plan adopted should be applicable for the 1970 elections.

Appointed commissioners organized and employed technical assistance to program the computer and furnish the commission apportionment plans generated by the computer from data furnished. The basic criteria included in the input fed into the computer were: equality of population, compactness and contiguity of districts. The 1960 federal census furnished the basic population data for all plans considered by the commission with certain arbitrary adjustments for population shifts.

Eleven plans were submitted to the commission with a population variance of from 1.09 to 1.20. Plan 7 with a population variance of 1.10 became the point of departure for the commission's work. The commission plan signed by all 14 members was filed April 1, 1969. Its largest House district was 29,590, the smallest 26,000; the largest Senate district was 58,622, the smallest 52,116. The ratio of extremes was 1 to 1.14 in the House and 1 to 1.12 in the Senate. A ratio of 1:1.14 means the largest district is 14 percent greater than the smallest.

After receiving the commission's recommendation the legislature on June 6 approved House File 781 which became law July 1. It provides the same high and low House districts as the commission plan but establishes a high Senate district of 58,822 with the smallest 52,116, making a population variance in the Senate of 1.13:1 between the largest and smallest districts.

Districts may be compared in two ways —the ratio of the smallest to the largest, or the deviation from an ideal district determined by dividing the number of districts to be established into the 1960 total state population. The commission generally applied the former criterion.

Population of Iowa as determined by the 1960 federal census was 2,757,537. The ideal district for a 100-member House has a population of 27,575, the ideal senate district for 50 members 55,150.

This language of Article III, section 36 as amended, grants this court original jurisdiction to review an apportionment plan adopted by the legislature:

"Upon verified application by any qualified elector, the supreme court shall review an apportionment plan adopted by the general assembly which has been enacted into law. Should the supreme court determine such plan does not comply with the requirements of the constitution, the court shall within ninety (90) days adopt or cause to be adopted an apportionment plan which shall so comply. The supreme court shall have original jurisdiction of all litigation questioning the apportionment of the

general assembly or any apportionment plan adopted by the general assembly."

Applicants for review are electors of various Iowa political subdivisions who contend House File 781 violates Amendment 14 of the federal constitution and Article I, section 6 of the Iowa Constitution because of the population variance in senatorial and representative districts.

They assert the legislature failed to make a good-faith effort to achieve equal population districts and certain provisions of the act constitute a delegation of legislative power; the provision of section 3(d), S.J.R. 5, set out supra, that no voting precinct shall be divided in forming a district prohibited use of the most accurate population data available and resulted in a greater deviation from equality than necessary; and the commission and General Assembly created districts of unequal size to increase proportionate representation for interest groups and rejected plans with districts less unequal than those of chapter 89.

They further assert unequal districts were created to preserve existing county, township and precinct boundaries, to preserve membership of incumbent legislators; there is no constitutional justification for the population variances; and more equally apportioned legislative districts could have been created.

Respondents are the governor, attorney general, secretary of state, secretary of the Senate and chief clerk of the House of Representatives. They deny all of applicants' contentions for invalidity and support the act as permitting only limited population variances which are unavoidable and de minimis despite a good-faith effort to achieve absolute equality, as nearly as practicable.

I. Applicants' contentions here may be summarized as asserting (1) chapter 89 created legislative districts with a population variance which violates both federal and state constitutional requirements and respondents have failed to justify deviation among districts; (2) S.J.R. 5 requiring preservation of voting precincts which resulted in greater population variance than necessary is unconstitutional and the same proscription in section 1(4), chapter 89, resulted in an unconstitutional apportionment; (3) adoption by the commission and General Assembly of a de minimis standard of population variance rather than an "as nearly equal as practicable standard" increased deviations from population equality; (4) chapter 89 unconstitutionally delegates to incumbent legislators placed in a certain district the power to determine among themselves who shall remain in office and who shall have his term ended prematurely; and (5) the act discriminates against certain electors, disenfranchising them totally.

II. In WMCA, Inc. v. Lomenzo, 377 U.S. 633, 653, 84 S.Ct. 1418, 1428, 12 L. Ed.2d 568; Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 674, 84 S.Ct. 1429, 1439, 12 L.Ed.2d 595; Davis v. Mann, 377 U.S. 678, 690, 84 S.Ct. 1441, 1447, 12 L.Ed.2d 609; Roman v. Sincock, 377 U.S. 695, 708, 84 S.Ct. 1449, 1457, 12 L.Ed.2d 620; and Lucas v. Forty-fourth Gen. Assem. of Colo., 377 U.S. 713, 734, 84 S.Ct. 1459, 1472, 12 L.Ed.2d 632, all decided the same day as Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, the Court said, "In Reynolds v. Sims * * * we held that the Equal Protection Clause requires that seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis."

Maryland Com. for Fair Rep. v. Tawes, supra, 377 U.S. at 674, 84 S.Ct. at 1439, 12 L.Ed.2d at 607, contains this statement:

"* * * [I]n determining the validity of a State's apportionment plan, the same federal constitutional standards are applicable whether the matter is litigated in a federal or a state court."

In Reynolds v. Sims, supra, 377 U.S. at 577, 84 S.Ct. at 1389–1390, 12 L.Ed.2d at 536, the Court said:

"By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

Roman v. Sincock, supra, 377 U.S. at 710, 84 S.Ct. at 1458, 12 L.Ed.2d at 630, furnishes this guideline:

" * * * [T]he proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

Reynolds and the five cases handed down the same date, cited supra, each involved legislative proposed plans for apportionment of seats in the two Houses of the Alabama, New York, Maryland, Virginia, Delaware and Colorado legislatures.

It is plain that population variances in the present legislative district apportionment in Iowa exceed variances held indefensible in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519, (deviations of only 3.13 percent above and 2.-84 percent below the average were held invalid; the ratio of the largest to the smallest district was 1.06 to 1) and in Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535, (deviations ranged from 6.4 percent above to 6.6 percent below the average). In H.F. 781 deviations in the House are 7.3 percent above and 5.7 percent below the average. In the Senate deviations are 6.6 percent above and 5.5 percent below the average.

In Kruidenier v. McCulloch, 258 Iowa 1121, 1149, 142 N.W.2d 355, 371, we noted the Supreme Court's recognition in Reynolds v. Sims, supra, of the impossibility of "mathematical exactness and precision" and quoted from that decision:

" * * * So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature." Id. at 579 of 377 U.S., 1391 of 84 S.Ct. 537 of 12 L.Ed. 2d.

Thus far the Supreme Court has not attempted to fix a percentage figure for permissible variation in legislative apportionment plans and has said that "the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment" is on a case-by-case basis. See Reynolds v. Sims, supra, 377 U.S. at 578, 84 S.Ct. at 1390, 12 L.Ed.2d at 537.

In Reynolds, following the quote set out in Kruidenier v. McCulloch, supra, the Court said, "But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation."

Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the state. Reynolds v. Sims, supra, 377 U.S. at 579, 84 S.Ct. at 1390, 12 L.Ed.2d at 537.

In Skolnick v. Illinois State Electoral Board, (N.D.Ill.E.D.), 307 F.Supp. 691, a

three-judge federal court considering Illinois' apportionment plans for its Senate and House of Representatives said:

"The Supreme Court has not in express terms withdrawn its suggestion at p. 578 [of 377 U.S., 1390 of 84 S.Ct., 537 of 12 L. Ed.2d] of *Reynolds* that, 'Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting.' The Court has, however, said that the standard in both situations is 'as nearly as practicable,' and has defined the standard, in *Kirkpatrick* (p. 531) [of 394 U.S., 1229 of 89 S.Ct., 525 of 22 L.Ed.2d], as permitting, 'only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown.'"

◼ The question is whether districts created by chapter 89 are based on population equality as nearly as is practicable as required by Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, and as that standard is clarified in later apportionment cases before the Supreme Court.

Although the Court in Reynolds v. Sims, supra, 377 U.S. at 560–561, 84 S.Ct. at 1381, 12 L.Ed.2d at 526, recognized Wesberry, which involved a congressional district apportionment plan, was not dispositive of or directly controlling that Court's decision in cases involving state legislative controversies, it said neither was it wholly inapposite and refers to Wesberry as an authority which "clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State."

Almost five years later on April 7, 1969, the Supreme Court in elucidating the "as nearly as practicable" standard announced in Wesberry, supra, said in Kirkpatrick v. Preisler, supra, 394 U.S. at 530, 89 S.Ct. at 1229, 22 L.Ed.2d at 524:

"The 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. See Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small."

In Kirkpatrick v. Preisler, supra, 394 U. S. at 531, 89 S.Ct. at 1229, 22 L.Ed.2d at 524, the Court rejected Missouri's argument there is a fixed numerical percentage population variance small enough to be considered in *de minimis* and to satisfy without question the "as nearly as practicable" standard. After detailing its reasons in support of rejection of the *de minimis* approach the Court could "see no nonarbitrary way to pick a cutoff point at which population variances suddenly become *de minimis*. Moreover, to consider a certain range of variances *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable."

The commission plan filed here, as previously noted, had deviations of 12 percent in the Senate and 14 percent in the House. It is clear the Iowa legislature started with these variances in creating legislative districts under House File 781.

In our opinion acknowledgement in Reynolds v. Sims, supra, of the impossibility of "mathematical exactness and precision" as a workable constitutional requirement which would justify "somewhat more flexibility" in state legislature apportionment plans does not permit a disparity of the magnitude created by House File 781 to be legally acceptable as "only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown" under the pronouncement in Kirkpatrick v. Preisler.

It was the burden of the State, respondents here, "to present * * * acceptable reasons for the variations among the populations of the various legislative districts with respect to both the senate and house of representatives." Swann v. Adams, 385 U.S. 440, 443–444, 87 S.Ct. 569, 572, 17 L. Ed.2d 501.

■ It is apparent from the record that in the commission plan as filed there are instances of districts being created to facilitate keeping present members in office and others of providing boundaries to avoid having present members contest with each other at the polls. The legislature made no apparent revision of the commission plan in this respect when enacting House File 781.

When such factors enter into reapportionment it cannot be said that "a good-faith effort to establish districts substantially equal in population has been made". In League of Nebraska Municipalities v. Marsh, (N.D.Neb.), 242 F.Supp. 357, 360–361, the court declared the goal of reapportionment is just representation of the people, not protection of incumbents in a legislative body.

Variations of 13 percent among Senate districts and 14 percent among House districts can hardly be deemed *de minimis*. On the contrary, Kirkpatrick held variations in the Missouri plan as noted supra, did not pass constitutional muster against the contention the deviation there was *de minimis*. In Lucas v. Forty-fourth Gen. Assem. of Colo., supra, 377 U.S. at 727, 734–735, 84 S.Ct. at 1472–1473, 12 L.Ed.2d at 642, the Court expressly reserved decision upon the validity of a variation of 7 percent. See Swann v. Adams, supra, 385 U.S. at 445, 87 S.Ct. at 572, 17 L.Ed.2d at 501.

In League of Nebraska Municipalities v. Marsh, supra, a three-judge federal court disapproved a ratio of 6 percent between the smallest and largest districts in Nebraska's legislative apportionment plan.

As a witness before the commissioner appointed by this court to hear and summarize evidence presented by applicants and respondents bearing on the constitutional validity of H.F. 781, the Senate majority leader testified that in considering legislative apportionment, he "took the position we should not allow any more variation in population in districts than what the commission had done".

This is a strong indication the legislature took the commission variation as a *de minimis* standard for a starting point rather than equality "as nearly as practicable".

There is no showing that departures from the fundamental objective of equal representation for equal numbers of people are unavoidable *or* justified upon any legally acceptable ground.

Obviously, we do not agree with respondents' contention pronouncements contained in Kirkpatrick v. Preisler and Wells v. Rockefeller, both supra, do not apply to reapportionment of state legislatures since congressional district apportionment plans were under attack in both cases. See Skolnick v. Illinois State Electoral Board, supra.

■ We conclude that population variances in legislative districts formed by chapter 89 whether viewed as to the ratio of the smallest to the largest district or from the standpoint of deviations of the districts above and below the ideal exceed those constitutionally permissible under enunciations of the Supreme Court.

III. As previously noted, applicants contend the proscription of S.J.R. 5(d) and section 1(4), chapter 89, that no voting precinct should be divided in forming a legislative district resulted in an unconstitutional population variance.

The Court in Reynolds v. Sims, supra, 377 U.S. at 578, 84 S.Ct. at 1390, 12 L.Ed. 2d at 536, in noting that some distinction

might be made between congressional and state legislative representation, said:

"* * * It may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. *To do so would be constitutionally valid, so long as the resulting apportionment was one based substantially on population and the equal population principle was not diluted in any significant way*" (Emphasis supplied).

In the foregoing guideline, although recognizing that a workable legislative plan of apportionment might be achieved by use of political subdivisions in the formation of legislative districts, the emphasized portion cautions to guard against resulting dilution of the equality of population principle.

This admonition is renewed in Wells v. Rockefeller, supra, 394 U.S. at 546, 89 S. Ct. at 1237, 22 L.Ed.2d at § 39, where the Court repeats this enunciation by Kirkpatrick that "to accept population variances, large or small, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people."

Guidelines furnished by the Supreme Court require legislatures to make a good-faith effort to achieve equality of representation in adopting a plan of apportionment. To follow the requirement of S.J.R. 5 and H.F. 781 that precinct voting lines be constantly kept intact in the formation of districts could make accomplishment of this goal impossible.

Support for a determination that elimination of the proscription would have resulted in greater population equality is found in this testimony of Professor Liittschwager, the technical assistant to the commission:

"The smaller the input regions the better one can get population equality. * * * Cities such as Waterloo have fairly large population precincts, and it is difficult to use regions of this size as building blocks to achieve equality. * * * The population inputs used to generate Plans 10 and 11 were townships and precincts. The use of smaller population units would, in my opinion, tend to further reduce the population variance. * * * Breaking of precincts would assist in getting a perfect plan. If I were to redistrict without being restricted to maintaining precincts intact, I assume that I would get the population figures from a census tract or enumeration district data which the census provides. It is my understanding that much of this data has already been collected by the Legislative Research Bureau. I assume that the Legislative Research Bureau could certify data based on enumeration districts using census tract groupings."

The legislature had no hesitancy in crossing county lines in redistricting under H.F. 781. Other governmental bodies do not always respect precinct voting lines and from time to time our cities and towns have altered such lines to achieve population equality. We are not aware of any valid reason why voting precinct lines may not be altered if it aids in accomplishment of a legally accepted apportionment "as nearly as practicable".

■ Under the circumstances before this court the requirement of keeping voting precincts intact was one of the factors which brought about constitutionally invalid apportionment. This directive prohibited use of the most accurate data available.

IV. All propositions urged have been considered whether individually mentioned or not in reaching our conclusion.

■ V. We turn now to the relief applicants seek—an order from this court providing apportionment of Senate and House districts for the 1970 elections. This part of their prayer rests on that portion of Article III, section 36, which provides that if this court determines an apportionment plan adopted by the General

Assembly does not comply with the constitutional requirements, it shall within 90 days adopt or cause to be adopted an apportionment plan which shall so comply.

This clause embodies two steps under the circumstances here: (1) a determination of the constitutional validity of the plan adopted (which we have reached) and (2) a requirement that this court, within 90 days after filing a decision determining invalidity, adopt or cause to be adopted a legally acceptable plan.

Compliance with the second step of this constitutional mandate presents unusual problems when its application to the 1970 primary election is attempted. We detail some at this time rather than retain jurisdiction of the matter for the purpose of entering a supplemental order either adopting or causing adoption of a valid redistricting plan which would be wholly ineffective for all practicalities because of the time element involved.

The time for holding primary elections is fixed by Code section 43.7 in this manner:

"The primary election by all political parties shall be held at the usual voting places of the several precincts on the first Tuesday after the first Monday in June in each even numbered year." The 1970 primary will thus be held June 2.

Section 43.11 provides for filing of nomination papers:

"Nomination papers in behalf of a candidate shall be filed:

"* * *.

"2. * * * for member of the general assembly, in the office of the secretary of state not more than eighty-five days nor less than sixty-five days prior to the day fixed for holding said primary election. * * *." The last day to file nomination papers for the 1970 legislature is March 29.

The 11 plans submitted to the commission had population variances of from 9 to 20 percent—greater deviations than those condemned in Kirkpatrick v. Preisler, supra. All were restricted by the command of S.J.R. 5(d) to keep voting precincts intact. None could pass constitutional muster under the guidelines furnished by the Supreme Court. We therefore have no available population-based apportionment plan which could be adopted by the court as an alternative to the one established by H.F. 781 and are confronted with the necessity of adopting or causing adoption of a legally acceptable plan without benefit of the commission's efforts.

Aid of the computer service would be desirable and could be obtained. Professor Liittschwager testified:

"The computer is still available to generate further legislative district plans in the State of Iowa. Within 30 to 45 days of receiving the population data, I could generate additional legislative redistricting plans for the State."

However, gathering necessary data would consume time. Even then any computer-generated plans submitted to the court would be based on 1960 census figures. The advisability of relying, even in part, on such ten-year-old data in establishing at this time a redistricting plan required to be based on substantial population equality would definitely be questionable. Additional time would be required for the court's consideration of plans submitted before formal adoption.

For us to adopt a constitutionally valid apportionment plan would require more time than is available before the last day for filing nomination papers for the 1970 legislature.

An additional consideration is presented by the first sentence of the amendment to Article III, section 35:

"The general assembly shall in 1971 and in each year immediately following the United States decennial census determine the number of senators and representatives to be elected to the general assembly and

establish senatorial and representative districts."

A change in the present districting plan by this court would undoubtedly be followed by another change for the 1972 election because of apparent population shifts which will be reflected in the 1970 census.

We decline to use population estimates as a basis for a plan of apportionment since we are not convinced of their accuracy.

For reasons stated we deem it unwise to undertake adoption or cause adoption of any redistricting plan for the 1970 elections. It is imperative that government continue and to that end deviations which otherwise might be fatal will be tolerated for the 1970 elections. Hence, for the purpose of this year's elections we will accept the provisions of H.F. 781 as an interim measure. Because of the constitutional defects in H.F. 781, the apportionment it prescribes may not be used after the 1970 elections.

VI. As instructed in Article III, section 36, we direct the 1971 legislature to adopt a plan of redistricting legally acceptable under the guidelines set forth in this decision, bearing in mind that "population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies" Reynolds v. Sims, supra, 377 U.S. at 567, 84 S.Ct. at 1384, 12 L.Ed.2d at 530, and further the caveat in Kirkpatrick v. Preisler, supra, 394 U.S. at 533, 89 S.Ct. at 1230, 22 L.Ed.2d at 526, that "problems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster."

All costs are taxed to the state of Iowa.

All Justices concur except LeGRAND, J., who concurs in Divisions I, II, and III of the opinion, but joins in Divisions I and II of the dissent by BECKER, J.

BECKER, Justice (dissenting).

I reluctantly dissent from Divisions IV, V and VI of the opinion and the result. My reluctance stems from the gravity of the issue and the unanimity of the court in reaching the indicated result. There is a new duty imposed on this court by amendment to the Iowa Constitution. Since I cannot agree that because of the time element involved we can or should fail to perform this duty, it seems necessary to set out the reasons for the position taken.

I. It should first be clear that I concur in Divisions I, II and III wherein this court finds the apportionment plan represented by House File 781 is unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This immediately brings us to our own duties under the recently adopted section 36 of Article III of the Iowa Constitution:

"Upon verified application by any qualified elector, the supreme court shall review an apportionment plan adopted by the general assembly which has been enacted into law. Should the supreme court determine such plan does not comply with the requirements of the constitution, the court shall within ninety (90) days adopt or cause to be adopted an apportionment plan which shall so comply. The supreme court shall have original jurisdiction of all litigation questioning the apportionment of the general assembly or any apportionment plan adopted by the general assembly." In the first sentence of Article 36 review is not simply permitted by this court on application by a verified elector. Such review is mandated. If we are to follow our Iowa Constitution we *must* review the matter.

Likewise if we determine such plan is unconstitutional, and we are apparently unanimous on the point, we *shall* "adopt or cause to be adopted" a constitutional plan. Professor Lettschwager testified new computer based plans could be generated within 30 to 45 days. This puts the constitu-

tional 90 day mandate for the whole task in a reasonable light. The preparation of material for computer assistance and the consideration of individual plans could be done within the 90 day limitation.

This duty is abnegated on practical grounds. It is said it is too late to adopt a wholly new plan. The result is predicated on the election dates and filing dates for the 1970 elections. A June primary is not sacrosanct. It is inferior in terms of constitutional law to what is plainly mandated by the constitution itself. If our action creates a time difficulty the legislature need only put the primary date back to the date used in 1968 to gain 97 days.[1] I cannot believe the legislature would refuse to change the primary voting date but if it did I believe this court would have the power and duty to declare any primary election based on the malapportioned formula to be void and to order a new election at a later date. This inheres in the new duty imposed on us by the Iowa constitutional amendment.

The resolution of this problem on "practical" grounds starts the immediate erosion of the new Iowa constitutional concept. Practical grounds are familiar constitutional rationalizations. Before Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, it was "impractical" to enter the "thorny thicket of reapportionment" so the courts tolerated the grossest kind of inequality. But whenever constitutional law has been followed according to its clear intent and purpose the "practical" difficulties have been met.

A large part of the fight over the United States Supreme Court's insistence on equal representation is waged from the doubtful base of what is practical. It is said to be impractical to expect a political body like the legislature to reapportion on the basis of substantially equal representation. This requires, not just bipartisanship, it requires nonpartisanship. It is submitted this was recognized by the 1965 and 1967 legislatures when they proposed a constitutional amendment for our Iowa Constitution. Presumably it was also recognized by the people of the state when they approved the amendment. The practical difficulties inherent in asking an elected (political) body to reapportion itself without regard to the election (political) results were recognized when the people looked to this court to do the job if all else failed. We should try to perform the duty.

It is no answer to say this plan is acceptable because it applies to only one legislature because of the new census. The admittedly malapportioned legislature will have the task of adopting a new apportionment plan. This simply perpetuates the wrong. Our action condoning this malapportionment notifies the legislature we will accept an unconstitutional result even though we are mandated not to do so.

As to the unreliability of the 1960 census figures, we have decided House File 781 is unconstitutional even though the legislature relied on those figures. We need not and probably should not use estimates, no matter how carefully made. The 1960 census figures are the best available. The point is, we are not talking about apportionment of the 1973 legislature. It is the malapportionment of the 1971 legislature that is at issue. The inequities inherent in the population shifts since the 1960 census are unavoidable no matter what we do. To use this as a reason for inaction begs the question.

There is little point in reviewing all cases ably noted in the majority opinion.

1. It should be noted the June primary date was adopted by the same 1969 legislature. Before that, in 1968 and for several prior elections, the primaries were held in September for one election. If the primary date formula for the 1968 election was again used the primary election would be held on September 8, 1970. Thus 97 days would be gained to perform this all important task without upsetting past voting patterns and with no prejudice to anyone. When time is no longer of the essence the legislature can, of course, set the primary election date as it desires.

None of those cases were decided by state or federal courts under the state constitutional mandate we have in Iowa.

On the subject of timing of the relief sought, the United States Supreme Court in Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506, said: "We do not consider here the difficult question of the proper remedial devices which federal courts should utilize in state legislative apportionment cases. Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in Baker v. Carr, 'any relief accorded can be fashioned in the light of well-known principles of equity.' "

Here the election is not imminent. There is time both to draw and implement a constitutional plan. Further it is no longer simply a matter of equity. Under our new state constitutional amendment we have a further mandate from our people.

This court should follow our new constitutional provision and cause a constitutionally acceptable reapportionment plan to be adopted.

II. There is another reason for reapportionment by this court which is not considered by the majority. This is the disenfranchisement of the voters of the Fourth Ward in Waterloo, Iowa. The 1967 legislature assigned certain Ward Four Precincts to Subdistrict One of the Thirty-second Senatorial Districts. This did not meet with opposition because the senate seat was not up for vote in 1968. The 1969 legislature took the precincts out of Subdistrict One and assigned them to another district where the senatorial seat is not up for vote in 1970. Thus the people of the affected precincts lost their vote for senator both in 1968 and in 1970. Apparently they have not had a chance to vote for senator since 1964 and will not have a chance to so vote until 1972, if then, (the 1971 reapportionment might again shift them elsewhere).

The above situation involves several thousand voters. Such disenfranchisement, if justifiable at all, must be justified on the strongest basis of necessity in meeting equal population standards. Such justification is not in the record.

To me, at least, this situation is a very strong additional reason for reapportionment by this court because no correction can be made without affecting the balance of other districts.

III. If the foregoing analysis is wrong the court has another alternative to House File 781. In an effort to achieve a bipartisan result the legislature caused an apportionment commission to be formed. As noted by the majority, the resolution providing for the commission made it impossible for the commission to achieve a constitutional result by prohibiting division of

precincts. Nevertheless the commission tried and did come up with a solution that, while not constitutionally acceptable, was at least a little closer to equality than House File 781. Not only was the result closer to equality, it was also fairer, at least to the major political parties, because it was worked out from a somewhat more equal bargaining position.

If it is too late to make a new constitutional plan, it is not too late to cause the adoption of the plan finally agreed upon by the bipartisan commission set up by the legislature. The record is replete with instances of the way the bipartisan committee traded areas and juggled the districts for political rather than equality purposes. The legislature then continued the same process, worsening the result.

*Of the two plans the fairer and more equal, from the constitutional standpoint, is the commission's plan.* Pressure of time and practicality does not militate against this plan. It was adopted by the commission, delivered to the legislature and is substantially complete. If a new plan is not to be formulated by this court as directed by the constitution, I believe the commission plan should be implemented. Any necessary minor corrections could be speedily made.

Of the three alternatives open to this court, (1) formulation of a new plan, (2) adoption of the commission plan, and (3) affirmance of House File 781, the least acceptable both from the standpoint of constitutional law and plain fair dealing is the third alternative adopted by the majority. I would proceed in accordance with the constitutional mandate and adopt or cause to be adopted a constitutionally adequate population based legislative apportionment plan. I must therefore dissent from Divisions IV, V and VI and the result.

LeGRAND, J., joins in Divisions I and II.