193 N.W.2d 784 (1972)
In the Matter of the LEGISLATIVE DISTRICTING OF the GENERAL ASSEMBLY of the State of Iowa as Enacted by the 64th General Assembly of the State of Iowa, House File 732.
Louise NOUN et al., Applicants,
Hugh D. Clark and James J. Wengert, Applicants,
Clifton Larson, Applicant,
v.
Richard C. TURNER, Respondent.
Nos. 55021-55023.
Supreme Court of Iowa.
January 14, 1972.
Dan Johnston, of Jesse, LeTourneau & Johnston, Des Moines, for applicants *785 Louise Noun, Jean Lloyd-Jones and Edris Owens.
Harry H. Smith, Sioux City, for applicants Hugh D. Clark and James J. Wengert.
Robert D. Fulton, Waterloo, for applicant Clifton Larson.
Richard C. Turner, Atty. Gen., Richard E. Haesemeyer, Sol. Gen., and Elizabeth A. Nolan, Asst. Atty. Gen., for respondent.
REES, Justice.
This original proceeding is the outgrowth of the effort by the Sixty-fourth General Assembly to devise a constitutionally valid reapportionment plan for the Iowa Legislature. House File 732, Acts of the 64th G.A., now appearing as Chapter 95, Laws of 64th G.A., First Session, apportions the membership of the Senate and House of Representatives of the General Assembly for the 1972 elections.
This is in fact the consolidation of three separate proceedings, all instituted by the filing of applications on the same date, to-wit, July 15, 1971; the first proceeding identified as cause number 55021 was initiated on application of Louise Noun, Jean Lloyd-Jones and Edris Owens; the second proceeding, number 55022, was instituted on the application of Hugh D. Clark and James J. Wengert; and the third, identified as number 55023, was instituted on the application of Clifton Larson. The three applications were consolidated for hearing and disposition by order of this court entered September 7, 1971. All of the applicants are concededly qualified electors of this State.
Applicants Noun, Lloyd-Jones and Owens, in their application contend:
1. House File 732, Acts 64th G.A., is an unconstitutional plan of apportionment because the legislature applied a de minimis standard in enacting it.
2. House File 732, Acts 64th G.A., is an unconstitutional plan of apportionment because the legislature allowed impermissible considerations to arbitrarily increase and decrease the voting strength of individual voters.
3. The League of Women Voters' plan for apportionment of the Iowa Legislature is a constitutional plan which the court should adopt pursuant to Article III, § 36, Constitution of the State of Iowa.
In the second application, that of applicants Clark and Wengert, it is contended:
1. House File number 732 is unconstitutional since it provides for legislative districts with population variances that are not as nearly equal as practicable, and which do not reflect only the limited population variances which are unavoidable despite a good faith effort to achieve absolute equality, or for which justification has been shown by respondent.
2. House File 732 is unconstitutional since the legislature took a de minimis standard in fashioning districts as a starting point rather than equality "as nearly as practicable" and thus increased deviations from population equality.
3. House File 732 is unconstitutional since the equality of population principle among legislative districts was diluted significantly for the unjustifiable purposes of: (a) protecting incumbents; (b) preserving present districts; (c) avoiding joining part of a rural county with an urban county; (d) establishing "over-kill" districts for partisan advantage; and (e) insuring the passage of a reapportionment bill by the legislature.
4. House File 732 is unconstitutional since the legislature failed to enact apportionment plans available to it with districts substantially more equal in population than that of House File 732.
The contentions of applicant Larson are:
1. The use, by the 64th G.A., of a de minimis standard in establishing legislative districts to protect incumbent legislators, *786 and to provide partisan political advantage rather than using an "as nearly equal as practical standard" to achieve precise mathematical equality violates the 14th Amendment of the Constitution of the United States and Article I, § 6 of the Constitution of the State of Iowa.
2. An apportionment plan enacted by the General Assembly that sacrifices compactness as a requirement for legislative districts in order to protect incumbency and provide partisan political advantage violates Article III, § 34, of the Iowa Constitution.
3. The Supreme Court, pursuant to the Iowa Constitution, should adopt or cause to be adopted, an apportionment plan for the Iowa General Assembly, and in so doing should terminate the terms of all senators elected in 1970 and provide that senators elected in 1972 should be elected for two or four years in accordance with the requirements of the Iowa Constitution.
By amendment to the several applications, applicants pray for money judgment against the respondent in varying amounts for expenses incurred in preparing plans of apportionment for presentation to this court which allegedly meet the requirements of the constitutions and laws of the United States and the State of Iowa, other incidental expenses and salaries, and for reasonable attorneys' fees for counsel for the respective applicants.
By an amendment approved at the general election in 1968, sections 34, 35 and 36 of Article III of the Constitution of the State of Iowa were amended to read as follows:
"§ 34. Senate and House of Representativesnumber of members apportionment

"SEC. 34. The senate shall be composed of not more than fifty (50) and the house of representatives of not more than one hundred (100) members. Senators and representatives shall be elected from districts established by law. Each district so established shall be of compact and contiguous territory. The state shall be apportioned into senatorial and representative districts on the basis of population. The general assembly may provide by law for factors in addition to population, not in conflict with the constitution of the United States, which may be considered in the apportioning of senatorial districts. No law so adopted shall permit the establishment of senatorial districts whereby a majority of the members of the senate shall represent less than forty (40) percent of the population of the state as shown by the most recent United States decennial census.
"§ 35. Apportionment following decennial census; limitation; failure to complete apportionment; duty of Supreme Court

"SEC. 35. The general assembly shall in 1971 and in each year immediately following the United States decennial census determine the number of senators and representatives to be elected to the general assembly and establish senatorial and representative districts. The general assembly shall complete the apportionment prior to September 1 of the year so required. If the apportionment fails to become law prior to September 15 of such year, the supreme court shall cause the state to be apportioned into senatorial and representative districts to comply with the requirements of the constitution prior to December 31 of such year. The reapportioning authority shall, where necessary in establishing senatorial districts, shorten the term of any senator prior to completion of the term. Any senator whose term is so terminated shall not be compensated for the uncompleted part of the term.
"§ 36. Review of apportionment plan

"SEC. 36. Upon verified application by any qualified elector, the supreme court shall review an apportionment plan *787 adopted by the general assembly which has been enacted into law. Should the supreme court determine such plan does not comply with the requirements of the constitution, the court shall within ninety (90) days adopt or cause to be adopted an apportionment plan which shall so comply. The supreme court shall have original jurisdiction of all litigation questioning the apportionment of the general assembly or any apportionment plan adopted by the General Assembly."
In conformity with the constitutional mandate, the 64th General Assembly enacted a legislative reapportionment plan which is identified as House File 732. This legislative measure is under attack in these proceedings.
A commissioner was appointed by this court to conduct a hearing under the rules of equity with power to limit the evidence to relevant issues. The commissioner was directed to have the hearing reported and to file a transcript thereof with this court, together with a written summary but without findings of fact or conclusions of law. The transcript of the proceedings and the commissioner's summary are before us.
From the record it is apparent that as related to the 1970 decennial census the ideal state senatorial district for the State of Iowa would embrace a population of 56,500 (total state population divided by 50), and the ideal state representative district would have a population of 28,250 (total state population divided by 100). The largest senatorial district established by House File 732 is district 30, which is located in northwestern and northern Des Moines, in Urbandale and western rural Polk County, with a population of 57,365. The smallest senatorial district is district 44, composed of the counties of Fremont, Page, Taylor, Adams, part of Adair, and portions of southern Guthrie County, southwestern Dallas County, and northwestern Madison County, with a total population of 55,575. It would appear, therefore, that the overall population deviation among senatorial districts is 1.0322 to 1, or approximately 3.2 percent. The total population of the 26 smallest senatorial districts established by House File 732, which could theoretically elect a constitutional majority of the membership of the Senate is 1,459,243, or 51.65 percent of the State's total population. Thirty-seven of the 50 senatorial districts established by House File 732 have populations which vary less than one percent above or below the ideal; six districts have a population greater than one percent above the ideal; and seven districts have a population which is more than one percent below the ideal.
The largest house district established by House File 732 is district 59, located in Urbandale and western rural Polk County, with a population of 28,833. The smallest district is district 81, composed of Monona, northern Harrison and western Crawford Counties with a population of 27,769. Thus, the overall population deviation among representative districts is 1.038321, or approximately 3.8 percent. The total population of the 51 smallest districts established by House File 732, that is, the smallest percentage of the State's population which could theoretically elect a constitutional majority of the membership of the House of Representatives, is 1,429,740, or 50.6 percent of the State's total population. Sixty-eight of the 100 districts established by House File 732 have populations which vary less than one percent above or below the ideal; 16 districts have a population greater than one percent above the ideal, and 16 districts have a population which is more than one percent below the ideal.
Against the above brief factual backdrop, we turn to a consideration of the contentions presented by the applicants in their several applications.
I. We first consider applicants' complaint that a de minimis standard was used by the legislature. In the Matter of the Legislative Redistricting of the General Assembly of Iowa (Rasmussen, et al. v. *788 Ray, et al.), 175 N.W.2d 20, 24, 25 (Iowa 1970), this court held:
"Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the state. Reynolds v. Sims, supra, 377 U.S. [533] at 579, 84 S.Ct. [1362] at 1390, 12 L.Ed.2d [506] at 537."
We also quoted Kirkpatrick v. Preisler, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519, 524:
"Almost five years later on April 7, 1969, the Supreme Court in elucidating the `as nearly as practicable' standard announced in Wesberry [v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481], supra, said in Kirkpatrick v. Preisler, supra, 394 U.S. at 530, 89 S.Ct. at 1229, 22 L.Ed.2d at 524:
"`The "as nearly as practicable" standard requires that the State make goodfaith effort to achieve precise mathematical equality. See Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.'
"In Kirkpatrick v. Preisler, supra, 394 U.S. at 531, 89 S.Ct. at 1229, 22 L.Ed.2d at 524, the Court rejected Missouri's argument there is a fixed numerical percentage population variance small enough to be considered in de minimis and to satisfy without question the `as nearly as practicable' standard. After detailing its reasons in support of rejection of the de minimis approach the Court could `see no nonarbitrary way to pick a cutoff point at which population variances suddenly become de minimis. Moreover, to consider a certain range of variances de minimis would encourage legislators to strive for that range rather than for equality as nearly as practicable.'"
The above principles go to the heart of the reason for the prohibitions against use of a de minimis approach in solving the legislative apportionment problem. Applicants contend the apportioning authority cannot fix a percentage of deviation standard within which it can safely operate and then proceed to fix district lines based on impermissible considerations.
Respondent does not seriously dispute that the prohibition against the de minimis approach is the law. He stoutly maintains such an approach was not in fact used. We do not question the good faith of the legislator-witnesses who deny using the de minimis approach. However, it is our duty to make our own independent judgment on the evidence produced. Our study of the evidence impels a contrary conclusion.
A tentative plan was accepted which has a deviation of 3.83 percent between high and low districts. Once the highest and lowest acceptable figures were fixed by the legislative leaders all efforts to achieve voter equality ceased. Further efforts were aimed at different objectives; namely, rearrangement of voting blocks to achieve greater acceptability to the individual legislators. This meant keeping present members of the legislature in office and providing districts that would avoid having such members contest each other. Thus passage of the plan was to be assured.
The legislator-witnesses frankly acknowledge the effect of such changes on the numerical equality goal was not considered, except for the prohibition against exceeding the percentage deviation already accepted.
We must therefore conclude the de minimis approach was used. This approach, coupled with avoidable population deviations occasioned by efforts to meet the goals noted in Division II, results in an unconstitutional apportionment plan.
II. We next consider applicants' contention that House File 732 is an unconstitutional plan of apportionment because *789 the legislature allowed impermissible considerations to increase or decrease arbitrarily the voting strength of the individual voters, and that the equal population principle among legislative districts was diluted significantly for the unjustifiable purposes of protecting incumbents, preserving present districts, avoiding joining part of a rural county with an urban county, and insuring the passage of a reapportionment bill by the legislature. We agree.
In 1970 this court invalidated the reapportionment plan enacted by the Acts of the 63rd General Assembly for similar reasons. In the Matter of the Legislative Redistricting of the General Assembly of Iowa (Rasmussen, et al. v. Ray, et al., 175 N.W.2d 20). At page 26 of the opinion we said:
"It is apparent from the record that in the commission plan as filed there are instances of districts being created to facilitate keeping present members in office and others of providing boundaries to avoid having present members contest with each other at the polls. The legislature made no apparent revision of the commission plan in this respect when enacting House File 781.
"When such factors enter into reapportionment it cannot be said that `a good faith effort to establish districts substantially equal in population has been made.'" (Emphasis supplied)
(Citing League of Nebraska Municipalities v. Marsh, (N.D.Neb.), 242 F.Supp. 357, 360-361, in which the court declared the goal of reapportionment is just representation of the people, not protection of incumbents in a legislative body.)
We feel the record before us is replete with testimony of witnesses tending to establish that districts were being created by House File 732 to facilitate keeping present members of the legislature in office and of providing boundaries of districts to avoid having such members contest each other at the polls.
Such considerations, which caused departures from the standards of population equality and compactness in the reapportionment districts, require us to hold House File No. 732 unconstitutional under both the Federal and State Constitutions. The same factors caused even greater avoidable deviations in the prior apportionment plan struck down by this court in Rasmussen v. Ray.
In fairness we must observe the "practical political advantage" referred to, in creating districts to protect incumbents, did not proceed solely to either political party, as there are instances of the creation of districts with predominantly Republican voter majorities, as well as the creation of districts with predominantly Democratic voter majorities. We also observe the witnesses before this court's commissioner testified with commendable fairness and candor, in our judgment. Nonetheless, the considerations of the protection of incumbent legislators in both houses which resulted in impermissible deviations from population equality and territorial compactness, render House File 732 unconstitutional under the Iowa Constitution, Article III, section 34, and our pronouncements in Rasmussen v. Ray.
In Rasmussen v. Ray, 175 N.W.2d at 24, this court cited with approval Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, 630, where the following appears:
"* * * [T]he proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."
*790 In Burns v. Richardson, 384 U.S. 73, 89, 86 S.Ct. 1286, 1295, 16 L.Ed.2d 376, at note 16, the following appears:
"The fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents, does not in and of itself establish invidiousness."
We need not elaborate on this statement and agree that the minimization of contests would not in and of itself be an impermissible consideration under the circumstances of the individual case; however, where, as here, a conscious effort is obviously present to devise and propose a plan which the legislature would adopt because it would protect the individual legislators at the polls, and districts lacking population equality or compactness are created for this political purpose, invidiousness is established.
The practical political considerations which entered into the development and passage of House File 732 are apparent to us throughout the entire transcript of testimony and the commissioner's summary. We are not insensible to the implications of practical politics. We must conclude, however, that the impermissible political considerations which impelled development of House File 732 so that it would be acceptable to the legislators merely because of political preferment cannot pass constitutional muster.
III. Applicants contend House File 732 is unconstitutional since the legislature refused to enact apportionment plans available to it with districts substantially more equal in population than those embraced in the measure, and applicants Noun, Lloyd-Jones and Owens urge us to adopt the plan of apportionment developed by the League of Women Voters, which they assert is a constitutional plan.
The relevance of the League of Women Voters' plan is not its availability as an alternate plan but rather its demonstration of applicants' principal thesis; namely, that plans more equal in population can be developed. The same census information was used in both the legislature's plan and the L.W.V. plan. Both plans used contiguity and compactness as necessary and permissible criteria; both plans successfully avoid subdivision of townships; both plans cross county and city lines where necessary. The difference between the two plans is in the elimination of residence of incumbent legislators and other political considerations in formulation of the L.W.V. plan. Neither plan achieves perfect equality but the result of hewing to the constitutional line is a substantial drop in percentage of deviation which is the end goal of a constitutionally permissible reapportionment plan.
The question before us is not whether some other plan which the legislature might have adopted is more or less constitutional than House File 732, as we know of no manner in which the question of constitutionality may be degreed. It is for us, rather, to determine only whether House File 732 is a valid apportionment plan, regularly adopted within acceptable guidelines.
The League of Women Voters' plan was developed after adjournment of the legislature. Although we consider the efforts of the League laudable, and its plan relevant, it remains our duty to develop a decennial plan in keeping with the constitutional mandate.
IV. Applicants assert the apportionment plan enacted sacrificed compactness as a requirement for legislative districts. Article III, section 34, of our State Constitution directs that each senatorial or representative district shall be of compact and contiguous territory, and further directs that the State shall be apportioned into such districts on the basis of population.
We feel the requirement of compactness must be construed to mean as compact as practicable, having proper regard for equality of population between the several districts. *791 The goal of any apportioning authority must be to provide for equality of population and territorial compactness as nearly as practicable.
Numerous districts in House File 732 are lacking in compactness. Nothing appears to indicate the strange shapes are necessitated by considerations of population equality or result from unfeasibility. The legislature failed to comply with the constitutional mandate to devise districts consisting of compact territory. As we interpret the Iowa Constitution, respondent had the burden of proof and he failed to sustain the burden to show why the legislature could not comply with the compactness requirement.
The districting plan, House File 732, must also fall for noncompliance with the compactness standard.
V. One of the contentions of applicant Larson is that this court should adopt, or cause to be adopted, an apportionment plan for the Iowa General Assembly, and in so doing should terminate the terms of all senators elected in 1970 and provide that all senators should be elected in 1972 to either two or four-year terms in accordance with the requirements of the Iowa Constitution.
In conformity with our conclusions House File 732 is unconstitutional, due to the effect of impermissible considerations in its adoption, we shall, as mandated by Article III, sections 34 and 35, of the Constitution of Iowa (as amended November 5, 1968), proceed immediately to the development and adoption of a decennial apportionment plan which in our judgment will comply with constitutional requirements. In this connection it will be necessary to and we shall establish fifty (50) senatorial districts, from each of which a senator must be elected at the 1972 elections, which districts will in the plan so adopted be numbered one (1) to fifty (50), inclusive. Our constitution (Article III, section 6, as amended, 1968) directs that "as nearly as possible one-half of the members of the senate shall be elected every two years". To give effect to this provision, at the 1972 general election twenty-five (25) senators shall be elected to serve two-year terms and twenty-five (25) shall be elected to serve four-year terms. For the purpose of determining initial tenure, the Chief Justice of this court shall decide by lot whether those seeking election from even-numbered districts or those seeking election from odd-numbered districts are to be selected for four years. This procedure, of course, will also dictate those who are to serve only two years. After 1972 all candidates for senatorial office shall stand for full constitutional four-year terms.
The shortening of the term of any senator elected to a four-year term at the general election in 1970 is in accordance with the provisions of Article III, section 35, of the Iowa Constitution, as amended November 5, 1968.
VI. By amendment to the applications in which all applicants join, it is asserted the applicants Noun, Lloyd-Jones and Owens have incurred expenses of $2,300 in the preparation of their application and supporting documents, that applicants Clark and Wengert have incurred incidental expenses in the amount of $300, and that applicant Larson has incurred expenses for computer services and salaries and incidental expenses in the total amount of $5,400. Applicants pray for judgment against the respondent in said amounts, and further pray for the allowance of attorneys' fees for attorneys for the respective applicants.
We have reviewed the authorities cited by applicants and by respondent as related to applicants' contentions. Doubtless the institution of this action by the several applicants was at least in their considered and collective judgments pro bono publico, but we are unable to find authority which would permit us to order the allowance of the incidental expenses enumerated in the *792 applications or to order the taxation of attorneys' fees for applicants' counsel. Attorney fees may not be awarded as part of costs unless clearly authorized by constitutional provision, statute, rule or contract. We, therefore, conclude that the prayer of the applicants for allowance of expenses incidental to the maintenance of their actions, or attorneys' fees for their respective counsel, cannot be allowed.
All of the ordinary costs of the action are taxed to the respondent to be paid by the State of Iowa.
This court will retain jurisdiction of this matter, and will file opinion supplemental hereto to reflect the plan of apportionment developed by it in accord with the constitutional direction.
All Justices concur.