[Civ. No. 41084. Second Dist., Div. Five. Oct. 29, 1973.]

PIO C. CASTORENA et al., Petitioners, v.
CITY OF LOS ANGELES, Respondent.

**COUNSEL**

Robert H. Perez, Arthur A. Corrales, Thomas Stanley, Armand Derfner, Mario Obledo, Miguel Garcia, Joe Ortega, Herman Sillas, Stanley Wm. Levy, Stanton L. Stein, Bruce Warner, Michael D. Saphier, Lawrence William Steinberg, Rudolph A. Diaz, Vilma S. Martinez, Sanford J. Rosen, Charles Nabarrete and Richard V. Cruz for Petitioners.

Laurence R. Sperber and Edmund G. Brown, Jr., as Amici Curiae on behalf of Petitioners.

Burt Pines and Roger Arnebergh, City Attorneys, Thomas C. Bonaventura, Assistant City Attorney and Thomas J. Theis, Deputy City Attorney, for Respondent.

**OPINION**

**KAUS, P. J.**—In this original proceeding for a writ of mandate, petitioners seek to enjoin the City of Los Angeles ("City") from using a councilmanic redistricting plan adopted in September 1972. They also ask that we order the City to adopt a redistricting plan proposed by petitioners or any other

"constitutionally valid reapportionment plan." We granted an alternative writ in January 1973. The city council elections, in which the challenged districting plan was used, were held as scheduled in April 1973.[1]

## BACKGROUND

In *Calderon* v. *City of Los Angeles,* 4 Cal.3d 251, 271 [93 Cal.Rptr. 361, 481 P.2d 489], filed March 2, 1971, our Supreme Court held that the City's charter provision for councilmanic districting based on registered voters, rather than population, was unconstitutional.

The City's charter (art. II, § 6, subd. 2(a)) was then amended to provide: "Between July 1 and September 15 of each tenth year, commencing with the year 1972, the Council shall, by ordinance, which shall be effective upon publication, redistrict the City into fifteen (15) districts, . . . [containing] as nearly as practicable, one-fifteenth of the total population of the City of Los Angeles. . . .

"In 1973, the terms of those members of the Council elected from the odd districts shall commence. The terms of those members of the Council elected from the even numbered districts shall commence in 1975."

Beginning in April 1972, petitioners became involved in the city council's redistricting efforts. They submitted two preliminary plans and a final plan of their own, the so-called MALDEF plan. After some months of discussion and dispute, a redistricting plan (L.A. City Ordinance No. 143900) was eventually passed on September 19 over the mayor's veto. It was published on September 22, 1972.

Petitioners' allegations and contentions are contained both in the petition and 200 pages of briefs.[2] The City filed both a demurrer and an answer, a memorandum of points and authorities, and about 10 exhibits, consisting largely of counterdeclarations justifying the redistricting with respect to petitioners' contentions. Supplemental material has been submitted by both sides. Although the City's answer denies many of the allegations in the petition, we assume that petitioners' factual allegations are true.[3]

---

[1]On October 10, 1972, petitioners filed their petition in the California Supreme Court, which then transferred the matter to us without having granted an alternative writ. The order of transfer contained no directions. Once the proceeding was transferred to us, various time problems prevented effective relief as far as the 1973 elections were concerned.

[2]In addition, they have submitted about 50 exhibits, consisting largely of maps, newspaper clippings and declarations regarding statistical profiles of voting patterns.

[3]Where fairness would so dictate, we shall note the City's disagreement with those allegations.

## PETITION

The petition is filed by various persons who live in the areas affected by the reapportionment, and by a grass-roots organization concerned with Mexican-American reapportionment problems. ("Chicanos for Fair Reapportionment.")[4] The petitioners purport to represent themselves and all other Chicanos living in the City. They allege:

· The city council is required by law to reapportion[5] the 15 councilmanic districts between July 15, 1972 and September 15, 1972.

· The population of the City based on the 1970 census, was 2.8 million; the Chicano population was about 518,800, or 18.4 percent of the total. About half of the Chicano population lives in the east-central area of the City, often called the "barrio."[6] ·

Chicano residents share a "vital community of interest based on a common cultural heritage, traditions, and the Spanish language"; discrimination by the "Anglo majority"[7] has forced upon them a community of interest in achieving equal opportunity; Chicanos are poorer than other groups; many of their objectives can be achieved only through the legisla-

[4]Petitioners state that the terms "Spanish surnamed," "Spanish-American," "Mexican-American," "Latin American," and "Chicano" are used interchangeably. In their briefs they speak mostly of "Chicanos." Although they necessarily rely on census data for the Spanish-surnamed population, they point out that the Spanish-surnamed population includes persons who are not of Mexican ancestry (such as Cubans) or not citizens. Petitioners' expert, Clifford Lazar, relies on the 1970 census data for Spanish-surnamed persons.

For the sake of brevity we shall speak of the persons petitioners represent as Chicanos.

[5]We use "redistricting" and "reapportionment" interchangeably in this opinion. "There is no agreed usage for terminology in this field . . . frequently the two terms are used interchangeably." (Polsby, Reapportionment in the 1970's (1971) p. 7.)

[6]Although petitioners' complaint is directed towards impacted Chicano areas, as reflected chiefly by city council districts 4, 13 and 14, it should be noted that not more than about half of the Chicano population lives in the affected areas. The lengthy discussion of the "community of interest" joining the Chicano community focuses either on "barrio" Chicanos or Chicanos living elsewhere in the City. There is no discussion whether impacted Chicanos and dispersed Chicanos have a similar community of interest.

The question whether petitioners are seeking responsive representation for 230,000 or 518,000 persons, although not relevant to our decision in this case, could be crucial if petitioners were to establish a basic entitlement to redistricting based on ethnic or racial grounds.

[7]Reference to an "Anglo majority" clouds, rather than clarifies, petitioners' contentions. The term "Anglo" is nowhere defined, and may or may not be synonymous with the Census Bureau's designation of "white."

tive process. Because the community of interest shared by Chicanos is generally not shared by the "dominant surrounding Anglo society," Chicanos can achieve their legislative goals only if they have a meaningful opportunity to elect to the city council persons who will be sensitive to the interests most important to the Chicano community.[8]

Chicanos were restricted in their access to the ballot for over 75 years;[9] previous city councils, in apportioning councilmanic districts "arbitrarily and discriminatorily dissected" Chicano neighborhoods, with the "intent and effect of diluting" Chicano voting strength and making it "almost impossible" for Chicanos in any one district to elect a councilman responsive to their interests.[10] As a direct and inevitable result of this discrimination, Chicanos are unrepresented in the city council. In the past 72 years there has been only one Chicano on the city council and there have been no other councilmen who adequately represent the views of the Chicano community.

On September 11, 1972, the city council passed Ordinance No. 143900, the redistricting plan challenged here; on September 15, 1972, the mayor vetoed the plan; on September 19, 1972, the city council overrode the mayor's veto, and on September 22, 1972, the ordinance was published.

Until the adoption of the challenged redistricting plan, no city council district had a majority of Chicanos. Under the previous districting plan, the maximum concentration of Chicanos was as follows: 41 percent (district 9), 38 percent (district 14), and 35 percent (district 4).[11] It is impossible to draw more than one district with a Chicano population concentration of 60 percent or greater. The plan adopted by the City

---

[8]As a matter of political theory it is perhaps debatable whether a substantial minority, such as the Chicanos in the City, achieves maximum clout by electing one or two representatives, rather than by being able to influence many—perhaps even a majority—by virtue of being a substantial "block" in many districts. Undoubtedly, however, most minority politicians seem to agree with petitioners. (See Reapportionment in the 1970's, *supra*, p. 51.)

[9]The discrimination alleged is based in part on the requirement, invalidated in *Castro* v. *State of California*, 2 Cal.3d 223, 242 [85 Cal.Rptr. 20, 466 P.2d 244], that voters read and write English, and by section 14217 of the Elections Code, which provides that all proceedings at the polls are to be conducted in English.

[10]The City denies all allegations of past and present discrimination.

[11]Necessarily, petitioners must rely on inexact data. Generally, the data for the present districting are undisputed. The ethnic data for the previous districting are not: other figures for district 9 show a 47 percent Chicano population.

provides for one district with a 67 percent Chicano population (district 14) and one with a 30 percent Chicano population (district 4).[12]

The petition continues: The California and United States Constitutions require that city council redistricting be carried out without constructing districts which dilute minority voting strength, and without regard to protecting incumbents. The City has refused to redistrict in a lawful manner; rather, "the City has sought to perpetuate the status quo by again carving up large geographically compact Mexican-American neighborhoods and incorporating the pieces into arbitrarily drawn districts with heavy Anglo population."

Petitioners also contend that the ordinance passed by the city council is void because, contrary to the requirements of the charter, it was not passed until September 19 and was not published until September 22, 1972.

Finally, petitioners allege that the City's plan is invalid because the Chicano districts were even-numbered (4 and 14) rather than odd-numbered, which means that councilmanic elections for those districts will not be held until 1975.[13]

PRELIMINARY MATTERS

Certain matters should be disposed of before evaluating petitioners' major contentions.

■ *The April 1973 Election.* When the petition was filed the April 1973 election had not been held. Today it is history. Even if petitioners' point regarding the even-numbering of districts 4 and 14 were well taken, it would not and should not follow that an invalid apportionment plan could not be used on an interim basis. (*Ely* v. *Klahr* (1971) 403 U.S. 108, 113-115 [29 L.Ed.2d 352, 356-357, 91 S.Ct. 1803]; *Legislature* v. *Reinecke,* 6 Cal.3d 595, 603 [99 Cal.Rptr. 481, 492 P.2d 385].) Petitioners' characterization of the statute as "void" adds nothing to resolving the issue. Reapportionment plans are not budget appropriations, as was made clear in *Reynolds* v. *Sims* (1964) 377 U.S. 533, 585 [12 L.Ed.2d 506, 541, 84 S.Ct. 1362]: "With respect to the timing of relief, a court can

---

[12]Some of the data which we ascribe to the petition, are actually submitted in the supporting exhibits.

[13]Under the charter, elections in odd-numbered districts were scheduled for 1973, and in even-numbered districts, for 1975. Petitioners contend that the effect of even-numbering the Chicano districts was to disenfranchise or dilute the votes of Chicanos unnecessarily for another two years.

reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree."

Since the next election will involve districts 4 and 14, the issue of the validity of the City's plan with respect to the numbering of districts is moot. (*Ely* v. *Klahr, supra,* 403 U.S. 108, 114 [29 L.Ed.2d 352, 356-357].)

 *The Alleged Lateness of the Redistricting Ordinance.* Petitioners argue, in effect, that the city council missed the boat because its ordinance was not passed over the mayor's veto until September 19 and was not published until September 22. The charter is silent on what is to happen if the city council fails to act within the time limits prescribed by it. "The requirements of a statute are directory, not mandatory, unless means be provided for its enforcement." (*Gowanlock* v. *Turner,* 42 Cal.2d 296, 301 [267 P.2d 310].)

When the Supreme Court in *Legislature* v. *Reinecke,* 9 Cal.3d 166, 167 [107 Cal.Rptr. 18, 507 P.2d 626], gave the state Legislature one last chance to enact "valid reapportionment measures," it was years past the constitutional deadline for the enactment of such laws. (See *Legislature* v. *Reinecke, supra,* 6 Cal.3d 595, 599, fn. 1.) We cannot believe that the Supreme Court encouraged legislative action which, if petitioners are correct, it would have been forced to void.

*Validity of MALDEF Plan.*[14] The validity or desirability of the plan submitted by the petitioners—the so-called MALDEF plan—is not really the issue before this court. Rather, it is the constitutionality of the plan adopted by the City. The MALDEF plan is only discussed for the purpose of focusing on petitioners' grievances. "The question is not whether another plan equally as good can be drawn. The Court takes cognizance of the fact that there are many different ways in which the Legislature could be apportioned and still meet constitutional requirements." (*Bussie* v. *Governor of Louisiana* (E.D.La. 1971) 333 F.Supp. 452, 463, modified 457 F.2d 796, vacated and remanded, *sub. nom. Taylor* v. *McKeithen* (1972) 407 U.S. 191 [32 L.Ed.2d 648, 92 S.Ct. 1980]; see also, *Gaffney* v. *Cummings* (1973) 412 U.S. 735, 754 [37 L.Ed.2d 298, 313, 93 S.Ct. 2321]); *White* v. *Weiser* (1973) 412 U.S. 783, 796-797 [37 L.Ed.2d 335, 346-347, 93 S.Ct. 2348].) Thus, in reviewing the City's plan, our position

[14]The plan submitted by petitioners is called the "MALDEF" plan. MALDEF is an acronym for Mexican-American Legal Defense and Educational Fund.

is entirely different from that of the Special Masters on Reapportionment appointed by the California Supreme Court. (See *Legislature* v. *Reinecke, supra,* 9 Cal.3d 166.) The masters did not pass on a "duly enacted political solution" to be recommended to the court, but recommended a plan of their own devising.[15]

## PETITIONERS' CONTENTIONS

A comparison of petitioners' own MALDEF plan with the one under attack, will clarify petitioners' contentions. First, while the City's plan provides for two districts, one with 67 percent (14th district) and the other with 30 percent (4th district) Chicano populations, the MALDEF plan provides for one district with 63.5 percent and another with 43.5 percent Chicanos.[16] Second, the 30 percent (4th) Chicano district contains a "high percentage" of persons who are either not of Mexican ancestry or, if so, not eligible to vote; further, because the rents and property values are too high it is not a "growth district" into which Chicanos are likely to move. Third, while the City's plan preserved the status of incumbents, so that each incumbent remained within his old district, under the MALDEF plan, the two Chicano districts would not contain the residences of an incumbent.[17]

The "major issue," as presented by petitioners, is "whether, in the face of a reapportionment plan which has the effect of diluting the voting strength

---

[15] See Report and Recommendations of Special Masters on Reapportionment (Sac. 7917, 7919, 7923) filed August 31, 1973, p. 6 (hereinafter referred to as "Master's Report").

[16] In a declaration submitted as an exhibit to their petition, petitioners' expert—an economist who prepared the MALDEF plan—asserts that in a district burdened with an Anglo incumbent, a population consisting of about 90 percent Chicanos is required to elect a Chicano councilman. This figure drops down to 75 percent if there is no incumbent. The reason given is the lower percentage of Chicanos who are eligible to register, who do so if eligible, who vote if registered and who take the trouble "to follow on down the ballot from the top" if they do vote.

While we must accept the general proposition that as between "Anglos" and Chicanos it takes more people to generate a given number of votes and further accept as a general proposition that—other things being equal—a Chicano who runs against an Anglo incumbent is less likely to be elected than he would be if there is no incumbent, we simply cannot accept the expert's attempts to translate the various tendencies which bring this about into exact figures. No bases therefor are revealed—they appear to be entirely speculative. The expert himself states that the use of certain figures borders on "estimating racism."

The long and short of it is that, however sincere petitioners' expert is, in 1973 the voters of Los Angeles turned out an "Anglo" mayor and elected in his place a member of a racial minority roughly equal in size to petitioners'.

[17] Fourth, an issue we have already disposed of, the City's plan even-numbered (14) the 67 percent Chicano district, while the MALDEF plan odd-numbered (13) the 63.5 percent Chicano district.

of a minority group (although allegedly maintaining population equality), the factors used by the reapportioning body which caused said dilution, cause the plan to be declared unconstitutional where, if such factors (incumbency, etc.) had caused a dilution through population deviations, the plan would be unconstitutional."

GUIDELINES

The basic principles for evaluating petitioners' claims are set forth in a series of United States Supreme Court cases.[18]

In *Burns* v. *Richardson* (1966) 384 U.S. 73 [16 L.Ed.2d 376, 86 S.Ct. 1286], the court held that a plan enacted by the Hawaii Legislature was "subject to constitutional challenge only upon a demonstration that the interim apportionment, although made on a proper population basis, was designed to or would operate to *minimize or cancel* out the voting strength of racial or political elements of the voting population." (384 U.S. 73, 89 [16 L.Ed.2d 376, 389] (italics added); see also *Fortson* v. *Dorsey* (1965) 379 U.S. 433, 439 [13 L.Ed.2d 401, 405, 85 S.Ct. 498].)

The generality of *Burns* was fleshed out in *Whitcomb* v. *Chavis* (1971) 403 U.S. 124 [29 L.Ed.2d 363, 91 S.Ct. 1858]. There a three-judge district court had found that a multimember county-wide district "illegally minimizes and cancels out the voting power of a cognizable racial minority. . . ." (403 U.S. at p. 144 [29 L.Ed.2d at p. 376].) The Supreme Court, in reversing, clarified some of the considerations involved in determining whether there is an infringement on voting rights: "Nor does the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population satisfactorily prove invidious discrimination absent evidence and findings that ghetto residents had less opportunity than did other Marion County residents to participate in the political processes and to elect legislators of their choice." (403 U.S. at p. 149 [29 L.Ed.2d at p. 379].)

"The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, *is not easily contained. It is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district.*" (*Id.*, at pp. 156-157 [29 L.Ed.2d at p. 383] (fn. omitted; italics added).)

---

[18]We make no attempt to review reapportionment law except to the extent that it is relevant to the particular issues raised in this proceeding.

Some consideration must also be given to *Taylor* v. *McKeithen, supra,* 407 U.S. 191, though the case suggests more than it holds.

A federal district judge had approved a master's proposal affecting four state senate seats in Louisiana. Under the master's plan, blacks would have had a slight majority in two of the four districts. The district court rejected a counterplan proposed by the state attorney general, which would have spread black voters more evenly among the districts, so that they would not command a majority in any one of them. (407 U.S. at p. 192 [32 L.Ed.2d at p. 649].) The Court of Appeals summarily reversed the district court, without writing an opinion. A majority of the Supreme Court granted certiorari, vacated the judgment of the Court of Appeals and remanded the case to that court "for proceedings in conformity with this opinion." (*Id.,* at p. 194 [32 L.Ed.2d at p. 651].)[19] In the course of giving its reasons why an opinion of the Court of Appeals would be of value to the Supreme Court, the majority said: "An examination of the record in this case suggests that the Court of Appeals may have believed that benign districting by federal judges is itself unconstitutional gerrymandering even where (a) it is employed to overcome the residual effects of past state dilution of Negro voting strength and (b) the only alternative is to leave intact the traditional 'safe' white districts." (*Id.,* at p. 193 [32 L.Ed.2d at p. 650].)

This statement, at best, is a suggestion that it is not unconstitutional for a federal judge to "gerrymander" where his purpose is to overcome the residual effect of past dilution of a racial minority's voting strength and his only alternative would be to leave traditional "safe" white districts intact. No such Hobson's choice confronted the city council.

The suggestion in *Taylor* v. *McKeithen* that "benign" discrimination is permissible in certain circumstances was actually applied in *White* v. *Regester* (1973) 412 U.S. 755 [37 L.Ed.2d 314, 93 S.Ct. 2332], affirming in part *Graves* v. *Barnes* (W.D.Tex. 1972) 343 F.Supp. 704. The district court had invalidated a Texas plan for reapportioning the state house of representatives which included multimember districts in major population centers such as Bexar and Dallas Counties. (412 U.S. at p. 759 [37 L.Ed.2d at p. 320].) The Supreme Court first noted that multimember districts are not per se unconstitutional, citing, inter alia, *Whitcomb* v. *Chavis, supra,* 403 U.S. 124, and *Burns* v. *Richardson, supra,* 384 U.S. 73.

---

[19]As Mr. Justice Rehnquist noted in dissent, this disposition really amounted to a directive to the Court of Appeals to write an opinion. (407 U.S. at p. 195 [32 L.Ed.2d at p. 651].)

"But we have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups. [Citations.] To sustain such claims, *it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential.* The plaintiff's burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." (412 U.S. at pp. 765-766 [37 L.Ed.2d at p. 324]. Italics added.)

The Supreme Court then affirmed the district court's findings that by the elective process " 'the black community has been effectively excluded from participation in the Democratic primary selection process,' *id.* at p. 726, and was therefore generally not permitted to enter into the political process in a reliable and meaningful manner." (412 U.S. at p. 767 [37 L.Ed.2d at p. 325].) The Supreme Court similarly affirmed the district court's findings of fact with respect to Mexican-Americans: "Single-member districts were thought required to remedy 'the effects of past and present discrimination against Mexican-Americans' . . . [¶] The District Court apparently paid due heed to *Whitcomb* v. *Chavis, supra,* did not hold that every racial or political group has a constitutional right to be represented in the state legislature, but did, from its own special vantage point, conclude that the multimember district, as designed and operated in Bexar County, invidiously excluded Mexican-Americans from effective participation in political life, . . ." (412 U.S. at p. 769 [37 L.Ed.2d at p. 326].)

■ Summarizing the Supreme Court's reapportionment opinions on the subject of ethnic or racial factors, they appear to say that while the primary standard for determining the validity of a reapportionment plan is still population equality,[20] ethnic considerations do play a part. While no group is entitled to any given quota of seats or to be represented as a group, nevertheless, where a jurisdiction has a history of discrimination which has limited the opportunity of an identifiable group to participate in the political system, a plan which perpetuates that discrimination is subject to constitutional scrutiny. If a legislature enacts a plan which has the effect of minimizing or cancelling out group voting strength and group members previously were denied an opportunity to participate in the political process, the court must invalidate that plan and take appropriate affirmative action.

---

[20]But see, e.g., *Gaffney* v. *Cummings, supra,* 412 U.S. 735, 740-742 [37 L.Ed.2d 298, 304-305], minimizing even this factor in noncongressional reapportionment.

To what extent these principles, standing alone, would trigger judicial intervention in the redistricting plan of the City at issue here, we shall presently discuss. Suffice it to say at this point that petitioners themselves seem to recognize that the City's plan would pass muster, were it not for the fact that it presented the voters of each district, including, of course, those in the 4th and 14th districts, with an incumbent councilman residing within the district. Indeed, on demurrer, we must accept petitioners' premise that but for the protection given incumbents, the plan would not have been enacted.[21]

*Gaffney* v. *Cummings, supra,* 412 U.S. 735 and *White* v. *Weiser, supra,* 412 U.S. 783 make it clear, however, that even considerations based on incumbency have their legitimate place in political redistricting.

In *White* v. *Weiser,* the district court had invalidated a plan for congressional districting—S.B. 1—submitted by the Texas Legislature. Two alternative plans were submitted to the court: Plan B, which generally followed the district lines of S.B. 1, including the preservation of incumbents, but corrected the population disparities in S.B. 1, and Plan C, which ignored the old district lines. The district court adopted Plan C. (412 U.S. at p. 793 [37 L.Ed.2d at p. 345].)

The Supreme Court reversed because the district court had adopted Plan C, which disregarded political configurations, rather than Plan B, which considered them. (412 U.S. at p. 797 [37 L.Ed.2d at p. 347].)

For our present purpose the remarkable feature of this reversal is that in forcing the district court to drop Plan C and adopt Plan B, the court acted in full realization of the fact that Plan B protected incumbents—as did the rejected S.B. 1—while Plan C did not. The fact that the districts in Plan C were "significantly more compact and contiguous" did not override the "state goals"—including the protection of incumbents—"enjoyed in S.B. 1 and, derivatively, in Plan B."[22] (412 U.S. at p. 797 [37 L.Ed. 2d at p. 347].)

That political considerations need not be muted to cloakroom whispers but may be freely aired on the floor of the legislatures which have the

---

[21]Petitioners' exhibits, which we consider as part of the petition, also assert that the chief legislative obstacle to the MALDEF plan was its failure to protect the interests of incumbents.

[22]The court also noted that Plan B was slightly preferable to Plan C from the point of view of population equality. The court's decision did not, however, turn on that factor. (412 U.S. at pp. 796-797 [37 L.Ed.2d at pp. 346-347].)

primary jurisdiction over legislative apportionment, was unequivocally asserted by the Supreme Court in *Gaffney* v. *Cummings, supra,* 412 U.S. 735, 752-753 [37 L.Ed.2d 298, 312]: "We are quite unconvinced that the reapportionment plan offered by the three-member Board violated the Fourteenth Amendment because it attempted to reflect the relative strength of the parties in locating and defining election districts. It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary. [Citations.] The very essence of districting is to produce a different—a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. *Politics and political considerations are inseparable from districting and apportionment.* The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when over-laid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. *The reality is that districting inevitably has and is intended to have substantial political consequences.*" (Italics added.)

## DISCUSSION

As is apparent from petitioners' formulation of the "major issue," their basic complaint is that the redistricting illegally "dilutes" the voting strength of Chicanos, particularly because the dilution was caused by a factor—the desire to protect incumbent councilmen—which, had it caused dilution through population deviations, would make the redistricting unconstitutional. An examination of the record sustains neither premise of petitioners' position.

## 1. DILUTION

In a way petitioners' argument illustrates how inexact use of language can lead astray. Undeniably courts have at times used the term "dilution" as a constitutional pejorative (e.g., *Taylor* v. *McKeithen,* 407 U.S. 191, 193

[32 L.Ed.2d 648, 650, 92 S.Ct. 1980]) but, to paraphrase, "proof of dilution in the air, so to speak, will not do." It is meaningless to speak of dilution as a constitutional wrong, unless there is a particular concentration of voting strength to which identifiable minorities—be they racial, ethnic, political, religious or whatever—are entitled.

There is no such constitutional command. If *Whitcomb* v. *Chavis, supra,* teaches us anything it is that, absent other factors, a group with distinctive interests has no right to be represented in a legislative body simply because "it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district." As the court points out, to recognize such a right in one distinctive minority, would force its recognition on behalf of other groups such as "union oriented workers, the university community"—an important factor in towns such as Berkeley, California—"or ethnic groups occupying identifiable areas . . ." (403 U.S. at p. 156 [29 L.Ed.2d at p. 383].)

In no case of which we are aware has the Supreme Court spoken of "dilution" as such, as the evil which authorizes judicial intervention in a legislature's business. Thus in *Gomillion* v. *Lightfoot* (1960), 364 U.S. 339, 346 [5 L.Ed.2d 110, 116, 81 S.Ct. 125], the court spoke of an alleged "withdrawal" of the vote, which was found to present a litigable claim. In *Burns* v. *Richardson, supra,* 384 U.S. 73, 89 [16 L.Ed.2d 376, 389], as well as in *Whitcomb* v. *Chavis, supra,* 403 U.S. 124, 143 [29 L.Ed.2d 363, 376], the court spoke of schemes which would *"minimize or cancel out"* the voting power of cognizable minorities. In *White* v. *Regester, supra,* 412 U.S. 755, 767 [37 L.Ed.2d 314, 325], where, as noted, the court affirmed certain portions of the district court's invalidation of the reapportionment of the Texas Legislature, the lower court was upheld because the evidence supported its judgment that in one county blacks were effectively *"excluded"* from participation in the primaries of one political party and were "therefore generally *not permitted to enter into the political process* in a reliable and meaningful manner." (Italics added.) As to another county the district court was affirmed because the evidence supports its judgment that Mexican-Americans were effectively *"removed"* from the political processes of the county. (412 U.S. at p. 769 [37 L.Ed.2d at p. 326].)

By no stretch of the imagination can petitioners claim that anything of the sort is happening to the minority on whose behalf they sue. Their real complaint is not that the redistricting plan under attack minimizes, or cancels their voting strength, or excludes or removes them from the political processes, but simply that it fails to make the most of their potential political power. Indeed, the only significance of the MALDEF plan is that

it proves—on demurrer—that the city council could have come up with a scheme which would have made the 1974 election of a Chicano councilman in the 14th district more probable and permitted Chicanos to be more optimistic about being an effective majority in the 4th district at some point in the distant future.[23]

Petitioners' patent and insurmountable problem is that the record submitted to us indicates the very opposite of an attempt to·"dilute" Chicano voting strength. Before the 1972 redistricting, no council district contained more than 41 percent Chicanos. After the 1972 ordinance at least one contained 67 percent. Indeed the creation of that district was the result of a studied effort to create a district in which Chicanos could elect a councilman attuned to their particular problems. The cases on which petitioners rely involve situations in which the challenged apportionment scheme either continued a system that had resulted in limiting the access of minority groups to the electoral process[24] or created a system which actually reduced minority group strength.[25]

The infinite citation of cases involving reductions in the number of minority group members in a district or the creation of multimember districts where none existed before, will not change the facts in this case. As noted, petitioners' real complaint is not that the city council minimized their voting strength, but that it did not avail itself of an opportunity to

---

[23]Of course, if this matter were to be tried, it may well appear that while the MALDEF plan is more favorable to the Chicano community than the scheme under attáck, other identifiable groups would be able to make the same claim of dilution as petitioners assert with respect to Ordinance No. 143900, with respect to the MALDEF plan.

[24]E.g., *Graves* v. *Barnes, supra,* 343 F.Supp. 704, affirmed in part, *sub. nom. White* v. *Regester, supra,* 412 U.S. 755; *Taylor* v. *McKeithen, supra,* 407 U.S. 191.

[25]See, e.g. (1) *Gomillion* v. *Lightfoot, supra,* 364 U.S. 339, 341 [5 L.Ed.2d 110, 113], the City of Tuskegee, formerly square-shaped was reformed into a 28-sided figure, the effect of which was to remove all but four or five of 400 Negroes, but no whites, from the city limits; (2) *Troxler* v. *St. John the Baptist Parish Police Jury* (E.D.La. 1971) 331 F.Supp. 222, 224, in which three urban-suburban areas, formerly each in a single ward, were attached to rural wards to reduce the urban-suburban influence; (3) *Smith* v. *Paris* (M.D.Ala. 1966) 257 F.Supp. 901, 903, modified and affirmed 386 F.2d 979, in which the former procedure for electing county Democratic committee members on a "beat" or district basis, was changed to an at-large basis, to offset the effect of increase in the number of black voters; (4) *Sims* v. *Baggett* (M.D. Ala. 1965) 247 F.Supp. 96, 109, in which three counties were combined into a single house district for the purpose of preventing the election of black house member. Cf. *Cousins* v. *City Council of City of Chicago* (7th Cir. 1972) 466 F.2d 830, cert. denied, 409 U.S. 893 [34 L.Ed.2d 151, 93 S.Ct. 85].

maximize it. That objective, even if permissible, is not constitutionally required.[26]

## 2. INCUMBENCY

Petitioners, of course, anticipate the point which we have so far made. Their reply is that the record shows that but for the council's desire to protect incumbents, a redistricting more palatable to the Chicano community would have been enacted.[27]

Reminding ourselves of petitioners' statement of the "major issue" as they see it, the question is whether a "dilution" which would be unconstitutional if brought about through disregard of the "one person, one vote" principle, is similarly unconstitutional if enacted because of the redistricting body's desire to protect incumbents.

This approach is fallacious. The fact that "dilution" is one of the consequences of impermissible malapportionment does not prove that constitutionally permissible considerations suddenly become impermissible because in a particular situation they may result in dilution.

We can find nothing in the cases which would authorize a court to invalidate an otherwise constitutional redistricting plan, simply because another plan might have been enacted had the redistricting body been blind to its impact on incumbents.[28] Again we emphasize the difference

---

[26]The data which petitioners submit as exhibits to their petition suggest strongly that any effort to maximize Chicano voting strength would be Sisyphean. The first problem would be to consider whether somehow the dispersed 50 percent of the Chicano population could be utilized. Then the redistricting would have to strike a most delicate balance between the rock of "impacting"—putting more Chicanos into a district than they need to elect one of their own—and the whirlpool of "diluting"—putting Chicanos into districts where their vote will be wasted as far as petitioners' objective is concerned. The perfect solution to that problem depends on clearly predicting voting habits of Chicanos as compared to others in the district. (See fn. 16, *ante*.) Obviously reasonable minds will always be able to differ on one or more of the many factors which would have to be taken into account, not just for the present, but for the next decennium. Inevitably rival plans seeking to achieve the same end would be presented. Inevitably, too, if petitioners' claim is justiciable, future city councils really should not even bother to redistrict, because a court will have to do it anyway.

[27]One of the sub-controversies is whether or not Ordinance No. 143900 throws the present Anglo incumbent of the 14th district to the wolves or whether he will retain his seat in spite of the 67 percent Chicano population in that district. Because, as will be seen, we are not concerned with the problem of incumbency as a whole, we are not concerned with incumbency in the 14th district in particular.

[28]*Gaffney* v. *Cummings, supra*, 412 U.S. 735, 753 [37 L.Ed.2d 298, 312] suggests that blindness to a plan's impact on incumbents is an impossibility, because

between our position and that of the masters whose recommendation is presently before the California Supreme Court. (See fn. 15, *supra*.) The masters very properly concluded that their objective "should not be the political survival or comfort of those already in office." (Masters Report, p. 19.) It does not follow, however, that a court is authorized to invalidate an otherwise legal plan because such objective is shown to have been one of the factors which entered into its adoption.

In all of the cases relied on by petitioners, other impermissible factors—numerical inequality or minimization of identifiable groups—were present.[29]

To summarize: As far as this particular case is concerned, the fact that considerations of incumbency prevented the city council from enacting a plan more acceptable to petitioners, is legally neutral.

Finally it should be pointed out that in *Wenke* v. *Hitchcock*, 6 Cal.3d 746, 755 [100 Cal.Rptr. 290, 493 P.2d 1154], the Supreme Court made it possible for members of legislative bodies which redistrict themselves to appear to ignore incumbency factors without really doing so. With respect to the redistricting of supervisorial districts in Orange County, the court held that an elector whose residence has been placed in a different district may, nevertheless become a candidate in his old district by moving there.

It is, of course, entirely speculative whether any present councilmen would have moved, had the 1972 redistricting ordinance failed to include his residence in the new district. However, the effect of *Wenke* is that even if the MALDEF plan had been adopted, petitioners would have no assurance that they have what they want: an open race.

### 3. Compensatory Districting

■ Petitioners' final contention is that the City's past record of discrimination against Chicanos through gerrymandering Chicanos, obligated it to enact an apportionment scheme that remedies the effect of prior inadequate representation. We agree that where there has been past discrimination affecting voting rights, the legislative body or the courts may

---

even if such impact is ignored when the lines are drawn on pieces of paper, it would not "remain undiscovered by the time [the plan] was proposed or adopted, in which event the results would be both known and, if not changed, intended."

[29]E.g., *In re Legislative Districting of General Assembly* (Iowa 1972) 193 N.W.2d 784, 789; *In re Legislative Districting of General Assembly* (Iowa 1970) 175 N.W.2d 20, 26; *League of Nebraska Municipalities* v. *Marsh* (D.Neb. 1965) 242 F.Supp. 357, 359, app. dismissed, 382 U.S. 1021 [15 L.Ed.2d 537, 86 S.Ct. 642]; *Klahr* v. *Williams* (D.Ariz. 1972) 339 F.Supp. 922, 927, *affd., Ely* v. *Klahr*, 403 U.S. 108 [29 L.Ed.2d 352, 91 S.Ct. 1803].

take this factor into consideration in adopting or rejecting an apportionment plan. (*White* v. *Regester, supra,* 412 U.S. 755, 767-770 [37 L.Ed.2d 314, 325-326]; cf. *Taylor* v. *McKeithen, supra,* 407 U.S. 191, 193.

Nevertheless, the practical limit of the consideration which a court can give to past discrimination is that it may help to elucidate how a particular new plan will discriminate in the future. Beyond that it is powerless. (*White* v. *Weiser, supra,* 412 U.S. 783, 795 [37 L.Ed.2d 335, 346].)

Petitioners allege facts showing how the barrio has been neglected with respect to municipal services and how the Chicano community, in general, has been discriminated against in such areas as municipal employment. In part, at least, they blame these evils on past dilution of their political potential.

Petitioners present a powerful political argument. Yet they furnish us with no guidelines with which a court could rule that an otherwise constitutional plan must nevertheless be revised because it does not sufficiently compensate for past wrongs.

### CONCLUSION

Thus binding precedent and recognition of the theoretical and practical limitations on judicial power, all compel us to deny the relief prayed for. Needless to say this result implies no denial of the political merits of petitioners' cause, as alleged, or of the pleaded grievances which have brought forth its assertion in this forum.

The alternative writ is discharged. The petition for a peremptory writ is denied.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied November 14, 1973.